Elizabeth KARLIN, M.D.; Planned Parenthood of Wisconsin, Inc.; Gary T. Prohaska, M.D.; Dennis D. Christensen, M.D.; and Summit Women's Health Organization, on behalf of themselves and their patients seeking abortions, Plaintiffs–Appellants, Cross–Appellees,

v.

C. William FOUST, in his official capacity as District Attorney for Dane County and a representative of the class of all district attorneys in Wisconsin; James E. Doyle, in his official capacity as Attorney General of Wisconsin; James Chambers, Michael Mehr, B. Ann Nevaiser, James Esswein, Rudolfo Molina, W.R. Schwartz, Mikki Patterson, Sidney Johnson, Sandra Makhorn, Pablo Pedraza, Glenn Hoberg, Wanda Roever, Ronald Grossman, and Darold Treffert, in their official capacities as members of the Wisconsin Medical Examining Board; Elaine August, Timothy D. Burns, Bonnie M. Creighton, Ruth E. Lindgren, Pamela A. Maxon, Lorraine A. Norem, Roberta P. Overby, McArthur Weddle, and Ann Brewer, in their official capacities as members of the Wisconsin Board of Nursing; Muriel Harper, Virginia Heinemann, Cornelia Hempe, Douglas Knight, and Anita Kropf, in their official capacities as members of the social worker section of the Wisconsin Examining Board of Social Workers, Marriage and Family Therapists and Professional Counselors; Joseph Leean, in his official capacity as Secretary of the Wisconsin Department of Health and Family Services; and K.B. Piper, in his official capacity as Administrator of the Division of Health of the Wisconsin Department of Health and Family Services, Defendants–Appellees,

and

E. Michael McCann, in his official capacity as District Attorney for Milwaukee County, Defendant–Appellee, Cross–Appellant.

Nos. 98–2043, 98–2262.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1998.

Decided Aug. 9, 1999.

Simon Heller (argued), New York City, Linda Balisle, Balisle & Robinson, S.C., Madison, WI, for Elizabeth Karlin, Dennis D. Christensen and Summit Women's Health Organization, Inc. in No. 98–2043.

Simon Heller (argued), New York City, for Elizabeth Karlin in No. 98–2262.

Michael H. Schaalman, Quarles & Brady, Milwaukee, WI, Dara Klassel, Planned Parenthood Federation of America, Legal Action for Reproductive Rights, New York City, for Planned Parenthood of Wisconsin, Inc. and Gary T. Prohaska in No. 98–2043.

Simon Heller, Center for Reproductive Law & Policy, New York City, for Planned Parenthood of Wisconsin, Inc. and Gary T. Prohaska in No. 98–2262.

Bruce A. Olsen (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for C. William Foust and James E. Doyle in No. 98–2043.

E. Michael McCann, pro se in No. 98–2043.

Michael B. Brennan (argued), Milwaukee County Dist. Atty's Office, Milwaukee, WI, for E. Michael McCann in No. 98–2262.

Nikolas T. Nikas, Americans United for Life Legal Defense Fund, Chicago, IL, for Amicus Curiae.

Before CUDAHY, COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case involves a number of facial constitutional challenges to Assembly Bill 441 ("AB 441"), which repealed and recreated Wisconsin's abortion informed consent statute, Wis. Stat. § 253.10, to require physicians who perform abortions to meet with their patients at least twenty-four hours before the abortion procedure to provide the patients with specific oral and printed information. The district court found most of the provisions of AB 441 constitutional after severing certain provisions and construing others as not requiring physicians to provide certain information to women who are pregnant as a result of sexual assault or incest or to women whose fetuses have been diagnosed with a lethal anomaly. Plaintiffs now appeal this decision. Plaintiffs contend that a number of AB 441's provisions are unconstitutional because they either (1) are impermissibly vague or (2) place an "undue burden" on a woman's right to obtain an abortion. Defendant McCann also appeals, challenging the district court's ruling that certain information need not be provided to sexual assault or incest victims. For the following reasons, we affirm in part and reverse in part.

## I. HISTORY

### A. AB 441

In 1996, Wisconsin enacted AB 441, which repealed and recreated Wisconsin's abortion informed consent statute, Wis. Stat. § 253.10. AB 441 contemplates a

number of comprehensive changes to the informed consent structure maintained under the previous informed consent statute.[1]

Similar to the previous informed consent statute, under AB 441, an abortion may not be performed by a physician unless the patient has given her voluntary and informed written consent. *See id.* § 253.10(3)(a). Consent to an abortion is considered "voluntary" under AB 441 only if it "is given freely and without coercion by any person." *Id.* § 253.10(3)(b). For a woman's consent to be considered "informed," AB 441 requires that two tiers of information be provided to her at least twenty-four hours before the abortion is to be performed. Under the first tier, either the physician who will perform the abortion or any other "qualified physician"[2] must meet with the woman in person and orally provide her the information set forth in § 253.10(3)(c)1.[3] Under the second tier,

1. Under Wisconsin's prior informed consent statute, the attending physician or a person assisting the attending physician had to provide verbally to a woman seeking an abortion the following information: (1) whether she was pregnant; (2) the number of weeks the woman was into her pregnancy; (3) the availability of public and private agencies and services that provide birth control information; (4) the availability of public and private agencies and services that provide assistance to women who choose not to have an abortion; (5) special guidance for minor women seeking abortions; and (6) any particular risks associated with the woman's pregnancy and the abortion technique to be employed. *See* Wis. Stat. § 253.10(1)(a) (repealed 1996). The attending physician or his or her assistant also had the option of providing the woman with information on the probable physical characteristics of the fetus. *See id.* § 253.10(1)(c) (repealed 1996).

The prior statute also required the physician or the assistant to distribute to the woman upon her request certain county-provided written information identifying agencies offering birth control information and assistance during the pregnancy and after the childbirth. *See id.* § 253.10(2) (repealed 1996). Prior to undergoing an abortion, a woman had to sign a statement acknowledging the receipt of the information required by the statute and stating that she freely consented to the abortion. *See id.* § 253.10(3) (repealed 1996). Obtaining the informed consent of a woman under the provisions of the previous version of § 253.10 was unnecessary if an emergency abortion was required because the continuation of the pregnancy posed an immediate threat and a grave risk to the life and health of the woman. *See id.* § 253.10(4) (repealed 1996).

2. "'Qualified physician' means a physician who by training or experience is qualified to provide the information required under sub. (3)(c)1." Wis. Stat. § 253.10(2)(g).

3. Section 253.10(3)(c)1 provides, in relevant part, that all of the following information must be orally conveyed to a woman at least twenty-four hours before the abortion is to be performed:

a. Whether or not, according to the reasonable medical judgment of the physician, the woman is pregnant.

b. The probable gestational age of the unborn child at the time that the information is provided. The physician or other qualified physician shall also provide this information to the woman in writing at this time.

c. The particular medical risks, if any, associated with the woman's pregnancy.

d. The probable anatomical and physiological characteristics of the woman's unborn child at the time the information is given.

e. The details of the medical or surgical method that would be used in performing or inducing the abortion.

f. The medical risks associated with the particular abortion procedure that would be used, including the risks of infection, psychological trauma, hemorrhage, endometritis, perforated uterus, incomplete abortion, failed abortion, danger to subsequent pregnancies and infertility.

g. That fetal ultrasound imaging and auscultation of fetal heart tone services are available that enable a pregnant woman to view the image or hear the heartbeat of her unborn child. In so informing the woman and describing these services, the physician shall advise the woman as to how she may obtain these services if she desires to do so.

h. The recommended general medical instructions for the woman to follow after an abortion to enhance her safe recovery and the name and telephone number of a physician to call if complications arise after the abortion.

i. If, in the reasonable medical judgment of the physician, the woman's unborn child has reached viability, that the physician who is to perform or induce the abortion is required to take all steps necessary under s. 940.15 to preserve and maintain the life and health of the child.

the information set forth in § 253.10(3)(c)2[4] must also be orally provided to the woman in person at least twenty-four hours prior to the scheduled abortion, although this information may be conveyed by qualified persons other than the physician performing the abortion or a qualified physician. The person providing the latter information must also give the woman specified state-provided printed materials. *See id.* §§ 253.10(3)(c)2.d, (3)(d). Both tiers of information must be conveyed to the woman "in an individual setting that protects her privacy, maintains the confidentiality of her decision and ensures that the information she receives focuses on her individual circumstances." *Id.* § 253.10(3)(c)3. In that setting, the provider(s) of the information must also afford the woman an adequate opportunity to ask questions. *See id.* § 253.10(3)(c)4. In addition, prior to the performance of the abortion, the woman must certify in writing that (1) she received the information required under AB 441; (2) the information was provided in the appropriate setting; and (3) all of her questions were answered in a satisfactory manner. *See id.* § 253.10(5)(c)5.

AB 441's twenty-four hour waiting period and informed consent requirements may be waived in the case of a "medical emergency." *Id.* § 253.10(3)(f). A "medical emergency" is defined as:

[A] condition, in a physician's reasonable medical judgment, that so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her

j. Any other information that a reasonable patient would consider material and relevant to a decision of whether or not to carry a child to birth or to undergo an abortion.

k. That the woman may withdraw her consent to have an abortion at any time before the abortion is performed or induced.

[l]. That, except as provided in sub. (3m), the woman is not required to pay any amount for performance or inducement of the abortion until at least 24 hours have elapsed after the requirements of this paragraph are met.

4. Section 253.10(3)(c)2 provides that the following information must be provided:

a. That benefits under the medical assistance program may be available for prenatal care, childbirth and neonatal care.

b. That the father of the unborn child is liable for assistance in the support of the woman's child, if born, even if the father has offered to pay for the abortion.

c. That the woman has a legal right to continue her pregnancy and to keep the child; to place the child in a foster home or treatment foster home for 6 months or to petition a court for placement of the child in a foster home, treatment foster home or group home or with a relative; or to place the child for adoption under a process that involves court approval both of the voluntary termination of parental rights and of the adoption.

d. That the woman has the right to receive and review the printed materials described in par. (d). The physician or qualified person assisting the physician shall physically give the materials to the woman and shall, in person, orally inform her that the materials are free of charge, have been provided by the state and describe the unborn child and list agencies that offer alternatives to abortion and shall provide her with the current updated copies of the printed materials free of charge.

e. If the woman has received a diagnosis of disability for her unborn child, that the printed materials described in par. (d) contain information on community-based services and financial assistance programs for children with disabilities and their families, information on support groups for people with disabilities and parents of children with disabilities and information on adoption of children with special needs.

f. If the woman asserts that her pregnancy is the result of sexual assault or incest, that the printed materials described in par. (d) contain information on counseling services and support groups for victims of sexual assault and incest and legal protections available to the woman and her child if she wishes to oppose establishment of paternity or to terminate the father's parental rights.

g. That the printed materials described in par. (d) contain information on the availability of public and private agencies and services to provide the woman with information on family planning, as defined in s. 253.07(1)(a), including natural family planning information.

death or for which a 24–hour delay in performance or inducement of an abortion will create serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions.

*Id.* § 253.10(2)(d). If the physician determines that a medical emergency exists, the physician must inform the woman, prior to the abortion if possible, of the medical indications supporting the physician's "reasonable medical judgment" that an immediate abortion is necessary and, if possible, obtain the woman's written consent prior to the abortion. *See id.* § 253.10(3)(f).

AB 441 makes certain accommodations for women seeking abortions who became pregnant as the result of sexual assault or incest. *See id.* § 253.10(3m). A woman who is the victim of sexual assault may bypass AB 441's twenty-hour waiting period and undergo an immediate abortion if she satisfies certain reporting requirements. *See id.* § 253.10(3m)(a). Similarly, if the woman is a victim of incest, the twenty-four hour period can be reduced to two hours if she satisfies comparable reporting requirements. *See id.* § 253.10(3m)(b).

AB 441 also provides that a physician must comply with the same informed consent and waiting period requirements if the woman seeking the abortion is a minor. *See id.* §§ 253.10(3)(a), (3)(c)7. However, in addition to the minor's informed and voluntary consent, the physician must also obtain the voluntary and informed consent under § 253.10 of one of the minor's parents or a qualified parent substitute before the physician may perform the abortion. *See id.* § 253.10(3)(c)7; *see also id.* § 48.375(4)(a)(1). As with adult women, a minor's informed consent may be waived if the physician determines that a "medical emergency" exists as defined under AB 441.

AB 441 contains three enforcement mechanisms. Section 253.10(5) provides that any person who violates § 253.10(3), § 253.10(3m)(a)2, or § 253.10(3m)(b)2 "shall be required to forfeit not less than $1,000 nor more than $10,000." In addition, AB 441 provides that a person who violates those same provisions may be liable to the woman upon whom the abortion was performed for compensatory damages, punitive damages ranging from $1000 to $10,000, and attorneys' fees. *See id.* § 253.10(6). Finally, a physician who violates § 253.10(3) may also be subject to professional discipline, ranging from limitations on to revocation of his or her license. *See id.* § 441.07(1)(f); § 448.02(3)(a); § 457.26(2)(gm).

## B. Procedural History

Plaintiffs are physicians who provide abortions and organizations that operate facilities where abortion services are provided.[5] Defendants are a number of various state government officials who are charged with implementing and enforcing AB 441. On May 1, 1996, one day after AB 441 was signed into law, plaintiffs filed suit seeking declaratory and injunctive relief from all provisions of AB 441, both on their own behalf and on behalf of their patients seeking abortions. Plaintiffs alleged that AB 441 violated their rights and the rights of their patients as guaranteed by the First and Fourteenth Amendments and sought a temporary restraining order and a preliminary injunction barring defendants from enforcing AB 441. The district court granted the temporary restraining order on May 6, 1996, which the parties agreed to extend until the district court ruled on plaintiffs' preliminary injunction motion. Plaintiffs' preliminary injunction motion was subsequently converted to a motion for permanent injunc-

---

**5.** Plaintiffs, as physicians and abortion facilities, have standing to bring this suit under *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). *See Planned Parenthood of Wisconsin v. Doyle,* 162 F.3d 463, 465 (7th Cir.1998).

tion, which the district court heard in June 1996.

Before the district court, plaintiffs facially challenged the constitutionality of AB 441 on three grounds. First, plaintiffs alleged that a number of AB 441's provisions were unconstitutionally vague. Second, plaintiffs contended that AB 441 was unconstitutional under *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), because AB 441 had both the purpose and the effect of imposing an "undue burden" on a woman's right to abortion, thereby violating the Due Process Clause of the Fourteenth Amendment. Finally, plaintiffs raised two First Amendment challenges to AB 441, alleging that AB 441 violated their First Amendment right to Free Speech by requiring physicians to purchase and distribute state-mandated information with which they may be ideologically opposed, and that AB 441 violated the Establishment Clause of the First Amendment because it requires physicians to distribute religious information to women seeking an abortion.

The district court denied plaintiffs' motion to enjoin AB 441 in its entirety, finding that AB 441 as a whole did not violate a woman's constitutional right to seek an abortion. However, the court did find certain provisions of AB 441 unconstitutional and severed them from the statute.[6] In addition, the district court found that AB 441 was constitutional only if the "medical emergency" provision contained in § 253.10(2)(d) is construed to provide that physicians may perform emergency abortions when there is a "significant threat to a woman's health" and only if certain of the informed consent requirements set forth in § 253.10(3)(c)2 are construed as

not requiring physicians to give specific information to women who are pregnant as a result of sexual assault or incest or to women whose fetuses have been diagnosed with a lethal anomaly.

On appeal, plaintiffs challenge the district court's conclusions that AB 441 is not unconstitutionally vague and that AB 441 does not have the effect or purpose of imposing an undue burden on a woman's right to an abortion. Defendant McCann cross-appeals, challenging the district court's severance of § 253.10(3)(c)1.g and its construction of § 253.10(3)(c)2.b.

## II. STANDARD OF REVIEW

We review the district court's factual findings for clear error. *See Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 507 (7th Cir.1998). We review the district court's legal conclusions *de novo. See United States v. Schilling,* 142 F.3d 388, 394 (7th Cir.1998); *Brownsburg Area Patrons Affecting Change,* 137 F.3d at 507; *see also Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (concluding that a court of appeals should review *de novo* a district court's determination of state law). Furthermore, in interpreting AB 441, we apply Wisconsin law and Wisconsin principles of statutory construction. *See K–S Pharmacies, Inc. v. American Home Prods. Corp.,* 962 F.2d 728, 730 (7th Cir.1992) ("When interpreting state laws, federal courts use the same principles as state courts do.").

## III. VAGUENESS ANALYSIS

Plaintiffs submit that the district court erred in determining that AB 441 was not unconstitutionally vague. Although plaintiffs argued before the district court that a

---

**6.** Those provisions severed from AB 441 included: § 253.10(3)(c)1.g requiring physicians to inform their patients that fetal ultrasound imaging and auscultation of fetal heartone services are available; § 253.10(3)(c)1.j. requiring physicians to inform their patients of "[a]ny other information that a reasonable patient would consid-

er material and relevant;" and certain parts of § 253.10(3)(d) and § 46.245(1) permitting the state to charge physicians a fee for the state-printed and county-compiled materials that AB 441 required physicians to distribute to patients. *See Karlin v. Foust,* 975 F.Supp. 1177, 1229 (W.D.Wis.1997).

number of AB 441's provisions were impermissibly vague, those challenges relevant to this appeal can be reduced to three main claims. First, plaintiffs argue that AB 441's "medical emergency" provision is unconstitutionally vague because it relies on an objective standard for evaluating a physician's decision to perform an emergency abortion. Second, plaintiffs contend that the differing medical emergency provisions set forth in AB 441 and § 48.375(4)(b)1 of Wisconsin's parental consent law create two conflicting standards applicable to minors' abortions. Finally, plaintiffs argue that some of the informed consent requirements contained in § 253.10(3)(c) are unconstitutionally vague because they require abortion providers to disclose broad categories of information to patients but fail to specify the exact content of what must be discussed in order to satisfy AB 441 and thereby avoid liability. Before we address each challenge, it is necessary to set forth the legal framework for evaluating vagueness challenges.

 The void for vagueness doctrine rests on the basic principle of due process that a law is unconstitutional "if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 44, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ("Due process requires that a State provide meaningful standards to guide the application of its laws."). In *Grayned,* the Supreme Court explained the rationale underlying the void for vagueness doctrine:

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act according-

ly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

408 U.S. at 108–09, 92 S.Ct. 2294 (footnotes omitted). These principles are not to be mechanically applied, however, as "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The Constitution tolerates a lesser degree of vagueness in enactments "with criminal rather than civil penalties because the consequences of imprecision" are more severe. *Id.* at 498–99, 102 S.Ct. 1186. The most important factor affecting the degree of clarity necessary to satisfy the Constitution is whether constitutional rights are at stake. *See id.* at 499, 102 S.Ct. 1186. When a law threatens to inhibit the exercise of constitutionally protected rights, such as the present case, the Constitution demands that courts apply a more stringent vagueness test.[7] *See id.*

 Thus, there are two means by which a statute can operate in an unconstitutionally vague manner. First, a statute is void for vagueness if it fails to provide "fair warning" as to what conduct will subject a person to liability. *See, e.g., Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) ("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense

---

**7.** In vagueness challenges alleging infringement of constitutionally protected rights, courts may strike down a statute as vague and facially invalid even if that statute is not impermissibly vague in all of its applications.

*See Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Village of Hoffman Estates,* 455 U.S. at 494–95, 102 S.Ct. 1186.

with sufficient definiteness that ordinary people can understand what conduct is prohibited."); *see also Village of Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186. Second, a statute must contain an explicit and ascertainable standard to prevent those charged with enforcing the statute's provisions from engaging in "arbitrary and discriminatory" enforcement. *See Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294 (reasoning that in order to avoid vagueness a statute proscribing penalties for unlawful conduct "must provide explicit standards for those who apply them" so as to prevent "arbitrary and discriminatory enforcement").

## A. AB 441's Medical Emergency Provision

■ A state abortion statute that interferes with a woman's choice to undergo an abortion procedure must contain a valid medical emergency exception to ensure that the statute is not applied in a manner that would constitute a significant threat to a woman's health. *See Casey*, 505 U.S. at 879–80, 112 S.Ct. 2791. Consistent with *Casey*'s mandate, AB 441 contains a medical emergency exception that excuses physicians from complying with the statute's informed consent requirements and the twenty-four hour waiting period if a "medical emergency" exists. *See* Wis. Stat. § 253.10(3)(f). AB 441 defines a "medical emergency" as:

[A] condition, in a physician's reasonable medical judgment, that so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her

death or for which a 24–hour delay in performance or inducement of an abortion will create serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions.

*Id.* at § 253.10(2)(d). By requiring that a physician exercise "reasonable medical judgment," AB 441 employs an objective standard for evaluating a physician's decision to perform an emergency abortion. Furthermore, because AB 441 has no overarching scienter requirement, a physician is liable for any violation of AB 441, including the medical emergency provision, without regard to his or her good faith attempt to comply with AB 441's provisions.

■ Plaintiffs raise three separate vagueness challenges to AB 441's medical emergency provision. First, they argue that the provision must contain either a subjective standard or an objective standard combined with a scienter requirement in order to survive constitutional scrutiny.[8] An objective standard alone, plaintiffs submit, is always void for vagueness in the abortion context. Second, plaintiffs contend that the medical emergency provision's objective standard fails to provide them with "fair warning" as to what conduct will subject them to liability under AB 441 because physicians may disagree as to what constitutes a "medical emergency" and, therefore, physicians will not be able to discern which emergency situations constitute a significant threat to a woman's health.[9] Finally, plaintiffs argue that AB 441's "reasonable medical judgment" standard is inadequate to prevent against the

8. For our purposes, these two arguments are more or less the same in that plaintiffs believe that a physician should not be held liable under AB 441's enforcement provisions for good faith medical determinations that are later adjudged to be medically unreasonable.

9. AB 441's medical emergency provision provides that a physician can bypass the waiting period and informed consent requirements if delaying the abortion for twenty-four hours would create a "serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions." Wis.

Stat. § 253.10(2)(d). Before the district court, plaintiffs challenged this definition on the ground that it was too narrow and would prevent some women with serious health risks from obtaining immediate abortions. Plaintiffs argued that the effect of this provision would be to contravene one of the central principles of *Casey* that a state is forbidden "to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Casey*, 505 U.S. at 880, 112 S.Ct. 2791.

risk of "arbitrary and discriminatory" enforcement of AB 441's liability provisions. Plaintiffs fear that an objective standard, as opposed to a subjective (*i.e.*, good faith) standard, puts physicians at risk that their emergency medical judgments will be second-guessed by those charged with enforcing and applying AB 441's provisions.

As best as we can discern, we are the first court to squarely address on the merits the issue of whether an objective standard in a medical emergency exception to an abortion informed consent statute is unconstitutionally vague. For the reasons set forth below, we conclude that an objective reasonableness standard does not render AB 441's medical emergency provision void for vagueness.

### 1. *An Objective Standard Is Not Per Se Unconstitutional*

█ We begin by addressing plaintiffs' threshold argument that an objective standard renders the medical emergency provision unconstitutionally vague as a matter of law. Plaintiffs rely primarily on *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998), a recent decision from the Sixth Circuit, for the proposition that, in the absence of a scienter requirement, an objective standard contained in a medical emergency exception to an abortion statute renders that statute void for vagueness. In *Voinovich,* the Sixth Circuit reviewed the constitutionality of an Ohio abortion statute that subjected physicians to both criminal and civil liability for performing post-viability abortions, except when the physician "in good faith and in the exercise of reasonable medical judgment" determined that a medical emergency existed. *Id.* at 204. The Sixth Circuit characterized this provision of the Ohio

The district court rejected plaintiffs' argument noting that the Supreme Court had entertained and rejected the same objection raised by the plaintiffs in *Casey* to essentially the same operative language in the medical emergency provision contained in Pennsylvania's abortion informed consent statute. *See Karlin,* 975 F.Supp. at 1219–21. As the district court noted, the challenged language in AB 441's medical emergency provision is virtually identical to the "serious risk of substantial and irreversible impairment of a major bodily function" the Court found constitutional in *Casey. See Karlin,* 975 F.Supp. at 1221; *see also Casey,* 505 U.S. at 879–80, 112 S.Ct. 2791 (quoting 18 Pa. Cons.Stat. § 3203 (1990)).

Because the Wisconsin legislature adopted language so similar to that contained in Pennsylvania's medical emergency provision, the district court concluded that the legislature intended to adopt the same meaning and interpretation given to Pennsylvania's definition and held constitutional in *Casey. Karlin,* 975 F.Supp. at 1221. Accordingly, the district court construed AB 441's medical emergency provision in a manner consistent with *Casey* "to allow physicians to perform immediate emergency abortions *when there is a significant threat to a woman's health.*" *Id.* Neither party appeals this ruling.

However, in challenging the provision's objective standard, plaintiffs appear to have overlooked the district court's holding on this point. Plaintiffs argue that the objective standard is constitutionally deficient, in part, because AB 441's medical emergency provision is replete with vague terms, thereby increasing the likelihood of second-guessing by prosecutors. Plaintiffs believe the terms "serious," "substantial," "irreversible," and "major bodily function," are ambiguous and that this ambiguity would have the effect of chilling physicians from performing abortions because physicians would fear that prosecutors would challenge their emergency medical determinations after the fact by arguing, for example, that only a "minor" bodily function of the woman would have been affected by the twenty-four hour delay or that the impairment occasioned by the delay would have been "insubstantial" or "reversible."

The difficulty with plaintiffs' argument is that a physician is no longer required to determine whether an abortion is necessary to avoid a "serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions." Instead, a physician is required to exercise reasonable medical judgment in determining whether an immediate emergency abortion is necessary to avert "a significant threat to a woman's health." The terms of which plaintiffs complain are no longer legally significant and, therefore, cannot form a proper basis for challenging the medical emergency provision on vagueness grounds.

statute as imposing a "dual" subjective and objective standard on a physician's medical emergency determination, meaning that a physician must have believed the abortion was necessary and that belief must have been objectively reasonable to other physicians. *See id.* This "dual" standard did not require a finding of scienter before a physician could be held criminally or civilly liable; rather, like AB 441, physicians faced liability for good faith medical determinations, if it was later determined that the physician's medical judgment was unreasonable. *See id.*

In striking down the statute as unconstitutionally vague, the Sixth Circuit relied on the Supreme Court's decision in *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), which the Sixth Circuit construed as strongly suggesting that a scienter requirement is necessary to avoid vagueness in statutes that subject a physician to liability for erroneous medical determinations. *See id.* Based on this reading of *Colautti*, the Sixth Circuit reasoned:

> The determination of whether a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being subsequently disputed by others. Moreover, the lack of scienter is·compounded by the fact that this Act requires that a physician meet both an objective and a subjective standard in order to avoid liability. While we need not decide whether employment of an objective standard with a scienter requirement would be constitutional, an objective standard without one is especially troublesome in the abortion context. In an area as controversial as abortion, the need for a scienter requirement is, as the Supreme Court [in *Colautti*] pointed out, particularly impor-

tant. In this area where there is such disagreement, it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably. Under the Act, a physician who performs a post-viability abortion ... may be held liable, even if the physician believed he or she was acting reasonably, and in accordance with his or her best medical judgment as long as others later decide that the physician's actions were nonetheless unreasonable. The objective standard combined with strict liability for even good faith determinations, "could have a profound chilling effect on the willingness of physicians to perform abortions," ... when the woman's life or health is threatened. The uncertainty induced by this statute therefore threatens to inhibit the exercise of constitutionally protected rights.

*Id.* at 205 (citation omitted). The Sixth Circuit concluded that, without a scienter requirement, the Ohio statute did not adequately notify a physician that certain conduct was prohibited and, therefore, physicians would be less willing to perform abortions. *See id.* Accordingly, the Sixth Circuit held that the "combination of the objective and subjective standards without a scienter requirement renders [the medical emergency exception] unconstitutionally vague, because physicians cannot know the standard under which their conduct will ultimately be judged." *Id.*

Plaintiffs submit that *Voinovich* should convince us to reach the conclusion that AB 441's medical emergency provision is unconstitutionally vague because. it contains an objective standard rather than a subjective standard and provides for the imposition of liability without a finding of scienter.[10] We decline to do so for two reasons.

---

**10.** In support of their argument that an objective standard is always unconstitutionally vague in the abortion context, plaintiffs also rely on *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682 (3d Cir.

1991), *aff'd. in part and rev'd in part*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and *Fargo Women's Health Organization v. Schafer*, 18 F.3d 526 (8th Cir.1994). In *Casey*, the Third Circuit rejected a vagueness

First and foremost, we respectfully disagree with the Sixth Circuit's assessment of the Supreme Court's opinion in *Colautti* to the extent that the Sixth Circuit construed *Colautti* as requiring, or at least strongly suggesting, that an abortion statute imposing an objective standard on a' physician's medical determinations would be found unconstitutionally vague without a scienter requirement. In *Colautti*, the Supreme Court considered the constitutionality of a Pennsylvania abortion statute that required a physician who performed or induced an abortion to make a determination, "based on his experience, judgment or professional competence," that the fetus was not viable. 439 U.S. at 391, 99 S.Ct. 675 (internal quotation marks and citation omitted). If the physician determined that "the fetus [was] viable" or if "there [was] sufficient reason to believe that the fetus may be viable," then the physician was directed to utilize a statutorily prescribed abortion technique. *Id.* at 381, 99 S.Ct. 675. Violations of the statute subjected a physician to both strict civil and criminal liability. *Id.* at 381 n. 1, 99 S.Ct. 675.

The Supreme Court struck down the Pennsylvania statute as unconstitutionally vague not because it lacked a scienter requirement, but rather because it was unclear whether the statute imposed "a purely subjective standard,, or whether it impose[d] a mixed subjective and objective standard" on the physician's viability determination. *Id.* at 391, 99 S.Ct. 675. The Court concluded that the determination that the fetus "[was] viable" was to be based upon the attending physician's "experience, judgment or professional competence," a subjective standard, but it could not ascertain whether the "sufficient reason to believe that the fetus may be viable" determination was to be governed by a subjective or objective standard. *Id.* While the Court in *Colautti* did state that the vagueness of the statute was compounded by the fact that it subjected physicians to potential criminal liability without a finding of fault, the Court specifically declined to decide "whether, under a properly drafted statute, a finding of bad faith or some other type of scienter would be required before a physician could be held criminally responsible for an erroneous determination of viability." *Id.* at 396, 99 S.Ct. 675.

challenge to the medical emergency provision contained in Pennsylvania's abortion statute because the provision allowed a physician to forgo the statute's requirements and perform an emergency abortion on the basis of the physician's "good faith clinical judgment"—a subjective standard. *See* 947 F.2d at 702. Similarly, in *Schafer*, the Eighth Circuit rejected a vagueness challenge to the medical emergency provision of a North Dakota abortion statute because the provision allowed a physician to rely on his or her "best clinical judgment," which the court construed to be the equivalent to the "good faith clinical judgment" standard contained in the Pennsylvania statute, and the statute contained a scienter requirement. *See* 18 F.3d at 534–35. The Eighth Circuit found that those two factors saved the statute from being unconstitutionally vague. *See id.; cf. Planned Parenthood, Souix Falls Clinic v. Miller*, 63 F.3d 1452, 1463–67 (8th Cir.1995) (presuming that an abortion statute imposing strict criminal and civil penalties must contain a scienter requirement to avoid being held unconstitutional).

While *Casey* and *Schafer* certainly illustrate that a statute that contains a subjective standard alone (or a subjective standard combined with a scienter requirement in the case of *Schafer*) will not be found to be void for vagueness, we do not believe that these cases do not carry the force plaintiffs suggest. Although plaintiffs acknowledge that neither of these courts were called upon to decide the constitutionality of an objective standard, plaintiffs, nevertheless, argue that these courts would have found such a standard unconstitutionally vague absent a scienter requirement because they found that a physician's ability to rely on his or her judgment saved the statutes at issue from being void for vagueness. We decline to speculate as to what these courts would have done had they been asked to address the constitutionality of an objective standard. Furthermore, to the extent those courts would have found an objective standard unconstitutional,, or contain dicta that intimates as much, we disagree with that conclusion for the reasons we discuss *infra*.

In effect, the Supreme Court did not hold in *Colautti* that an abortion statute utilizing an objective standard without a scienter requirement is unconstitutionally vague. *See Voinovich v. Women's Med. Prof'l Corp.,* —— U.S. ——, 118 S.Ct. 1347, 1349, 140 L.Ed.2d 496 (1998) (Thomas, J., joined by Rehnquist, C.J. & Scalia, J., dissenting from denial of certiorari) ("[W]e have never held that, in the abortion context, a scienter requirement is mandated by the Constitution."). Instead, the Court only indicated that a scienter requirement could perhaps save an *already vague* statute from being voided on vagueness grounds; it never indicated that the absence of a scienter requirement itself creates vagueness when it does not otherwise exist. *See Colautti,* 439 U.S. at 396, 99 S.Ct. 675; *Voinovich,* 130 F.3d at 216 (Boggs, J., dissenting) ("[T]he principle invoked by the Court in *Colautti* simply is that a scienter requirement can mitigate the vagueness of an otherwise vague law— not that the absence of a scienter requirement will 'create' vagueness where it does not otherwise exist[ ]." (citation omitted)); *see also Village of Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186 ("[T]he Court has recognized that a scienter requirement *may mitigate* a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.") (emphasis added).

Furthermore, we find no compelling indication in *Colautti* that the Court struck down the statute because it believed imposing an objective standard on a physician's medical decisions was unconstitutional *per se* in the abortion context. To the contrary, the Court found the Pennsylvania statute unconstitutionally vague because the statute failed to identify clearly the overall standard that controlled a physician's viability determination; that is, the Court could not determine whether the statute imposed a purely subjective standard or one that contained both subjective and objective elements. In fact, the Court seemingly left open the possibility that a mixed standard (combining both subjective and objective elements), if clearly articulated, could be found constitutional without some finding of fault.

■■■ Because we find nothing in *Colautti* suggests that a properly worded mixed standard is *per se* void for vagueness in the abortion context, we are not willing to infer that the Court would find an objective standard *per se* unconstitutional. Although the Court did appear to recognize that the incorporation of an objective element could pose some hazards, *see Colautti,* 439 U.S. at 390–97, 99 S.Ct. 675, we nevertheless believe that had the Court concluded it was the objective portion of the statutory standard at issue in *Colautti* that caused the statute to fail for vagueness, it would have indicated that reason as the basis on which it was voiding the statute. In other words, if an objective standard *per se* creates vagueness in the abortion context, then the Court likely would have invalidated the statute on that ground alone. We believe the central principle established in *Colautti* is that an abortion statute that imposes liability on a physician for erroneous medical determinations is void for vagueness only if it leaves physicians uncertain as to the relevant legal standard under which their medical determinations will be judged. This interpretation is consistent with the standard by which vagueness challenges are to be examined. *See, e.g., Smith v. Goguen,* 415 U.S. 566, 578, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (reasoning that the absence of any ascertainable standard to which a person must conform his conduct is what offends the Due Process Clause).

Second, we also note that the standard employed in the Ohio statute considered in *Voinovich* was a dual objective-subjective standard. As such, the Sixth Circuit had no occasion to pass on the constitutional sufficiency of an objective standard alone. Therefore, we consider much of the court's analysis on this point as dicta. Furthermore, the Sixth Circuit in *Voinovich* held that it was the combination of objective

and subjective elements without a scienter requirement that rendered the Ohio medical emergency provision unconstitutionally vague; the rationale being that physicians could not know the standard under which their medical emergency determinations will ultimately be judged. AB 441, by contrast, creates no such uncertainty because it makes clear that the standard to which it will hold physicians' decisions is an objective one.

We must now determine whether AB 441's "reasonable medical judgment" standard provides "fair warning" to Wisconsin physicians of the relevant legal standard under which their emergency medical determinations will be judged and whether that standard is adequate to prevent those charged with enforcing and applying AB 441 from engaging in "arbitrary and discriminatory" enforcement of its provisions.

### 2. AB 441's Medical Emergency Provision Provides "Fair Warning"

■ We turn first to the issue of fair warning. Unlike the statutes at issue in *Colautti* and *Voinovich*, AB 441's medical emergency provision makes clear that the operative legal standard is an objective one. Thus, physicians are fully aware that they will be judged solely on an objective basis in making the determination that a medical emergency exists. Furthermore, the "reasonable medical judgment" standard clearly is an ascertainable and comprehensible standard that provides physicians with more than "fair warning" as to what conduct is expected of them in order to avoid the imposition of liability under AB 441 because this is the same standard by which all of their medical decisions are judged under traditional theories of tort law. As the district court noted, physicians have a duty to exercise due care, *i.e.* act reasonably, in treating all their patients and this duty extends to a physician's decision to perform an emergency abortion. *See Nowatske v. Osterloh,* 198 Wis.2d 419, 543 N.W.2d 265, 270–72 (Wis.

1996) (explaining that physicians in Wisconsin have a duty to exercise due care, the standard for which must be established by a determination of what is reasonable to expect of a physician given the state of medical knowledge at the time of the treatment at issue); *Department of Regulation & Licensing v. State Med. Examining Bd.,* 215 Wis.2d 188, 572 N.W.2d 508, 513 (Wis. Ct.App.1997) (explaining that the standard for determining if a physician failed to exercise due care is whether the physician used the degree of skill and care that a reasonable physician would use in the same or similar circumstances).

■ Plaintiffs offered evidence at trial that showed that there could be differences of opinion among physicians about whether certain medical conditions would be considered serious enough to fall within AB 441's medical emergency provision. As a result, plaintiffs argue that the provision fails to give physicians fair warning. While it is certainly true that physicians may disagree as to whether a specific situation rises to the level of posing a significant threat to a woman's health sufficient to necessitate an immediate abortion, the fact that one physician would choose to perform the emergency abortion under those circumstances while others would not, does not necessarily mean the former physician is acting unreasonably. In any given medical situation there is likely to be a number of reasonable medical options and disagreement between doctors over the appropriate course of action does not, of course, render one option reasonable and another unreasonable. As the district court noted, "[i]f there are two reasonable options, in this case either performing an emergency abortion immediately or waiting 24 hours, the doctor who chooses either of those reasonable options will have acted within her reasonable medical judgment." *Karlin,* 975 F.Supp. at 1222. Furthermore, assessing the seriousness of a risk to a patient's health and the necessity of immediate treatment is something that physicians are called upon to do routinely

under an objective standard knowing that if they make an objectively erroneous determination they may be subject to civil liability.

■ In reaching this conclusion, we are mindful of the Supreme Court's admonition that a state abortion statute should not unduly limit a physician's discretion in making medical determinations. *See, e.g., Colautti,* 439 U.S. at 396–97, 99 S.Ct. 675 (reasoning that a physician must be afforded adequate discretion in the exercise of his medical judgment). AB 441, however, does not take away a physician's discretion to make emergency medical determinations. Rather, it allows a physician to exercise the broad discretion traditionally relied upon in such situations—it simply provides that the physician's decision must be objectively reasonable. AB 441 does not tie the hands of the physician by specifying those medical conditions that would be considered serious enough to warrant an emergency abortion. That decision is left to the discretion of the attending physician to determine based on the individual circumstances of the woman's medical condition.

While physicians may feel more secure in determining that a medical emergency exists under AB 441 if they know that their emergency medical decisions need only satisfy a subjective good faith standard, a state's decision to hold a physician's emergency medical determination to an objective standard alone does not render the medical emergency provision impermissibly vague. There is no showing in other emergency contexts that an objective standard impermissibly limits a physician's discretion in making similar decisions. Plaintiffs fail to offer any compelling reason why the abortion context should be any different. Accordingly, we conclude that AB 441's "reasonable medical judgment" standard provides "fair warning" to physicians of the conduct that will subject them to liability under AB 441.

### 3. *AB 441's Medical Emergency Provision Provides for "Fair Enforcement"*

■ Plaintiffs also argue that AB 441 fails to provide an adequate standard to guide those charged with the enforcement of its provisions. Plaintiffs contend that an objective standard, while appropriate in the tort context, is inappropriate under AB 441 because, in addition to traditional civil liability, AB 441 imposes professional discipline and quasi-criminal penalties in the form of forfeiture upon physicians who make unreasonable emergency medical determinations. For this reason, plaintiffs submit that AB 441's objective standard is inadequate to restrain prosecutors and state licensing authorities from engaging in "arbitrary and discriminatory" enforcement of AB 441's provisions. We disagree.

■ A statute or statutory provision that proscribes penalties for violations is impermissibly vague when it fails to provide a definite standard of conduct, thereby giving prosecutors, courts, and jurors unfettered freedom to act on nothing but their own preferences and beliefs. *See Smith,* 415 U.S. at 575, 578, 94 S.Ct. 1242. To avoid a finding of vagueness in the abortion context, a statute that imposes liability for violations of its provisions must provide an explicit standard for those who enforce or apply the statute's provisions so as to prevent them from engaging in arbitrary and discriminatory enforcement. *See Colautti,* 439 U.S. at 390–94, 99 S.Ct. 675.

It is certainly a stretch to argue that AB 441 fails to provide an explicit standard for those who apply it. AB 441 clearly indicates that those charged with enforcing AB 441's provisions must assess a physician's conduct under an objective standard. Such a standard does not permit those charged with enforcing AB 441's provisions to bring arbitrary actions because enforcement actions can properly be brought only when it is reasonably believed that a physician made an objectively unreasonable decision to perform an emer-

gency abortion. *See Kolender,* 461 U.S. at 357–58, 103 S.Ct. 1855 (stating that a statute imposing criminal penalties is unconstitutionally vague only if it fails to provide "minimal guidelines to govern law enforcement," thereby allowing arbitrary enforcement by the government). Just as AB 441's "reasonable medical judgment" standard clearly provides the standard to which physicians must conform their conduct, that same standard provides the guideline pursuant to which prosecutors, state licensing authorities, and civil plaintiffs can seek to hold physicians liable for erroneous emergency medical determinations. Accordingly, we conclude that AB 441, by employing an objective standard, does not impermissibly delegate the decision to prosecute, to seek to hold liable, or to impose liability to prosecutors, state licensing authorities, courts, and juries for "resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 109, 92 S.Ct. 2294.

It appears that plaintiffs are really arguing that AB 441's objective standard places physicians at greater risk that their emergency medical judgments will be second-guessed by prosecutors and state licensing authorities. Plaintiffs contend that the fear of being second-guessed for good faith, albeit medically unreasonable, emergency medical determinations will chill physicians from performing emergency abortions that they otherwise would have performed, thereby infringing on a woman's constitutional right to obtain an abortion. This argument seems to be derived from such cases as *Colautti, see* 439. U.S. at 390–97, 99 S.Ct. 675, and *Doyle, see* 162 F.3d at 469, in which it has been recognized that a statute prohibiting certain conduct so vaguely that it makes physicians afraid to perform constitutionally permissible abortions is quite likely to infringe upon constitutional rights. In this context, however, we disagree with plaintiffs' argument and conclude that AB 441's medical emergency abortion will not have the effect of impermissibly chilling physi-

cians from performing emergency abortions in Wisconsin for two reasons. First, as we explained above, we do not believe the medical emergency provision is impermissibly vague. Second, as we will explain below, any potential chilling effect under AB 441 will be minimal.

A physician who violates the operative provisions of AB 441 is subject to civil liability, a "penalty" constituting monetary forfeiture, and professional discipline. Specifically, § 253.10(6) provides that a physician who violates AB 441's provisions can be held civilly liable to the woman upon whom the abortion was performed for damages arising out of the performance or inducement of the abortion, including compensatory damages, potential punitive damages ranging from $1000 to $10,000, and reasonable attorneys' fees. *See* Wis. Stat. § 253.10(6). Under AB 441's "penalty" provision, a physician who does not comply with the provisions of AB 441 "shall be required to forfeit not less than $1,000 nor more than $10,000." *Id.* § 253.10(5). Finally, a physician who violates AB 441 may also be subject to professional discipline. *See id.* § 441.07(1)(f); § 448.02(3)(a); § 457.26(2)(gm).

These three enforcement provisions closely parallel existing Wisconsin law and regulations pursuant to which physicians may be held liable for the provision of medical services (which necessarily include abortions). These laws and regulations, like AB 441, impose objective standards to which physicians must conform their conduct in order to avoid liability or discipline. Because there is no evidence that physicians are chilled in the performance of emergency services (including emergency abortions) in those contexts, we will not conclude that physicians will be impermissibly chilled from performing abortions under AB 441 simply because it employs an objective standard.

With respect to AB 441's provision for civil liability, it goes without saying that a physician is subject to financial liability

under traditional theories of tort law if he or she fails to exercise reasonable care. Thus, the fact that AB 441 provides that a physician who makes an unreasonable medical determination can be held civilly liable to the patient for damages arising out of the performance of the abortion cannot be said to impermissibly "chill" physicians in exercising their professional medical judgment that a medical emergency exists because they operate under the spectre of civil liability for unreasonable medical judgments everyday.

A close cousin to the recovery of monetary damages under AB 441 is the imposition of a monetary fine under AB 441's "penalty" provision. This provision would, at first blush, seem to be the most troublesome from a constitutional standpoint because an objective standard is most vulnerable in the abortion context when a statute imposes criminal or quasi-criminal penalties on constitutionally protected activity. *See Staples v. United States,* 511 U.S. 600, 605–06, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (explaining that statutes imposing strict criminal liability that require no mens rea are generally disfavored). However, we nevertheless conclude that AB 441's objective standard is adequate to protect physicians against the risk of indiscriminate forfeiture prosecutions.

As we discuss in greater detail in Part III.C.2 *infra,* the forfeiture provision of AB 441 merely levels a monetary fine for violations—there is no risk of incarceration nor is a violator labeled with the stigma of having been convicted of a misdemeanor or felony offense. Thus, the threat of potential financial liability under AB 441's forfeiture provision is, we believe, qualitatively no different from the threat of civil liability under AB 441. Because we have already concluded that the threat of financial liability under that section cannot be said to increase a physician's unwillingness to perform emergency abortions because the physician already faces the threat of financial liability at tort law for decisions to perform emergency abortions that are la-

ter adjudged to be medically unreasonable, it follows that the imposition of a monetary fine is likely to have no significant chilling effect on the performance of abortions in Wisconsin.

Finally, plaintiffs make much of the fact that physicians face professional discipline for violations of AB 441. *See, e.g.,* Wis. Stat. § 448.02(3)(a) (providing that an investigation of unprofessional conduct may be initiated upon an allegation that a physician has violated the informed consent or waiting period requirements of AB 441). Plaintiffs submit that the threat of professional discipline for good faith, albeit unreasonable, medical determinations would contribute in large part to a physician's unwillingness to perform emergency abortions. However, we must point out that under existing Wisconsin law physicians are already subject to professional discipline for unreasonable medical decisions in abortion and non-abortion cases alike. Under Wis. Stat. § 448.02 physicians are subject to investigation upon an allegation of "negligence in treatment." Wisconsin courts have construed this term to mean conduct falling below the civil standard of care for medical negligence, which is the same objective reasonableness standard employed by AB 441. *See Department of Regulation & Licensing,* 572 N.W.2d at 512–13 ("We do not see any reason to depart from the civil standard for medical negligence when determining whether, for disciplinary purposes, a physician was negligent in treating a patient."); *see also* Wis. Stat. § 448.02(3)(b) ("[A] finding by a court that a physician has acted negligently in treating a patient is conclusive evidence that the physician is guilty of negligence in treatment."). Because the failure to exercise reasonable care under such circumstances renders a physician subject to professional discipline under both existing Wisconsin statutory regulations and AB 441, we see no reason to conclude that the potential for professional discipline contemplated by AB 441 will have any increased chilling effect on the perfor-

mance of emergency abortions in Wisconsin.

In sum, we hold that AB 441's "reasonable medical judgment" standard is not void for vagueness for three reasons: (1) the standard clearly conveys to physicians that their emergency medical determinations will be judged on an objective basis; (2) physicians are accustomed to having their medical decisions adjudged under an objective standard; and (3) this same objectivity, we believe, provides an adequate safeguard against any risk of arbitrary and unfair enforcement.

## B. Contradiction Between Medical Emergency Provisions

In a related argument, plaintiffs challenge the constitutionality of AB 441's medical emergency provision on the ground that it conflicts with the emergency medical provision contained in the parental consent law found in Wisconsin's Children's Code, Wis. Stat. § 48.01 et seq. Section 48.375 of Wisconsin's parental consent law provides that a physician may not perform an abortion on a minor unless the physician has obtained the voluntary and informed written consent of the minor *and* the voluntary and informed written consent of one of her parents or a parent substitute under § 253.10 of AB 441 at least twenty-four hours before the abortion procedure. *See id.* § 48.375(4)(a)1.[11]

Under AB 441's medical emergency provision, a physician is permitted to perform an immediate emergency abortion when a condition arises that "in a physician's reasonable medical judgment" creates a "significant threat to a woman's health." *See Karlin,* 975 F.Supp. at 1221. However, Wisconsin's parental consent law also contains a provision permitting a physician to dispense with obtaining the minor's and parent's consent and to perform an immediate abortion on the minor woman if the physician determines "to the best of his or her medical judgment based on the facts of the case before him or her, that a medical emergency exists that complicates the pregnancy so as to require an immediate abortion." Wis. Stat. § 48.375(4)(b)1. Plaintiffs assert that these "conflicting" medical emergency provisions place a physician faced with an emergency medical situation involving a minor in a quandary because the physician will not know whether he or she should look to the parental consent law, which allows physicians to proceed with an emergency abortion if his or her subjective best medical judgment so dictates, or look to AB 441, which permits a physician to perform an emergency abortion only so long as the decision is objec-

11. Wisconsin's parental consent law provides in relevant part:

(4) **Parental consent required.**
(a) Except as provided in this section, no person may perform or induce an abortion on or for a minor who is not an emancipated minor unless the person is a physician and one of the following applies:
1. The person or the person's agent has, either directly or through a referring physician or his or her agent, received and made part of the minor's medical record, under the requirements of s. 253.10, the voluntary and informed written consent of the minor and the voluntary and informed written consent of one of her parents; or of the minor's guardian or legal custodian, if one has been appointed; or of an adult family member of the minor; or of one of the minor's foster parents or treatment foster parents, if the minor has been placed in a foster home or treatment

foster home and the minor's parent has signed a waiver granting the department, a county department, the foster parent or the treatment foster parent the authority to consent to medical services or treatment on behalf of the minor.
2. The court has granted a petition under sub. (7) [the judicial bypass procedure].
(b) Paragraph (a) does not apply if the person who intends to perform or induce the abortion is a physician and any of the following occurs:
1. The person who intends to perform or induce the abortion believes, to the best of his or her medical judgment based on the facts of the case before him or her, that a medical emergency exists that complicates the pregnancy so as to require an immediate abortion.
\* \* \*
Wis. Stat. § 48.375(4).

tively reasonable. Because a physician cannot know the standard under which his or her decision to perform an emergency abortion on a minor will be judged, plaintiffs argue that AB 441's medical emergency provision is void for vagueness.

The district court rejected plaintiffs' argument that the conflicting standards operated to render AB 441 unconstitutional. Recognizing that the two statutes imposed different standards on a physician's medical determination to perform an emergency abortion on a minor, the district court reasoned that "[i]f a physician is considering an emergency abortion for a minor, she will be immune from liability if she makes a decision based on reasonable medical judgment. Requiring doctors to comply with the stricter standard is constitutional and cures any potential vagueness concerns." *Karlin,* 975 F.Supp. at 1228. Although we agree with the ultimate conclusion reached by the district court that a physician must comply with AB 441's objective standard when deciding to perform an emergency abortion on any woman, including a minor, we do so because the two medical emergency provisions do indeed conflict, a conclusion the district court stopped short of reaching. For this reason we go one step further than the district court and recognize that AB 441 has impliedly repealed the medical emergency provision of the parental consent law.

Both statutes, on their face, purport to dictate the circumstances under which a minor's *and* a parent's voluntary and informed consent can be waived in the case of a medical emergency. Section 253.10(3)(a) of AB 441 provides that a physician may not perform an abortion on a minor woman unless both the minor and the individual who is required to give consent under § 48.375(4)(a)1 have each given their "voluntary and informed consent" to the abortion procedure. *See also* Wis. Stat. § 253.10(3)(c)7. Similarly, § 48.375(4)(a) of the parental consent law provides that a physician may not perform an abortion on a minor unless the physi-

cian has received "under the requirements of s. 253.10, *the voluntary and informed written consent of the minor and the voluntary and informed written consent of one of her parents.*" (emphasis added).

The parental consent law then provides that the obtainment of the minor's and parent's informed consent pursuant to § 253.10 can be waived and an emergency abortion performed if the physician believes "to the best of his or her medical judgment based on the facts of the case before him or her" that a medical emergency exists—a subjective standard. *See id.* § 48.375(4)(b). This stands in direct contrast to AB 441's medical emergency provision under which a physician can perform an emergency abortion without obtaining the voluntary and informed consent of the minor and her parent only if the physician in the exercise of "reasonable medical judgment" (*i.e.,* objectively) determines that a medical emergency exists that creates a significant threat to a woman's health. *See id.* §§ 253.10(2)(d), (3)(c); *Karlin,* 975 F.Supp. at 1221. These statutes have the effect of establishing conflicting standards by which a physician's decision to waive informed consent and perform an emergency abortion on a minor will be adjudged.

However, while plaintiffs are correct that the two statutes operate to impose conflicting standards on a physician's decision to perform an emergency abortion on a minor, this conflict does not render AB 441 void for vagueness. As we explained in Part III.A, standing alone, AB 441's medical emergency provision is not vague. Nor does the fact that the parental consent law imposes a different standard on a physician's decision to perform an emergency abortion automatically cause AB 441's medical emergency provision to be void for vagueness. Instead, the conflicting provisions in the two statutes concerning emergency abortions for minors creates a question of implied repeal under Wisconsin law.

The Wisconsin Supreme Court has defined "implied repeal" as "[t]he ab-

rogation or annulling of a previously existing law by the enactment of a subsequent statute ... which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force...." *State v. Dairyland Power Coop.*, 52 Wis.2d 45, 187 N.W.2d 878, 881 (Wis.1971) (citation omitted). Under Wisconsin law, the implied repeal of a statute by a later enactment is disfavored. *State v. Black*, 188 Wis.2d 639, 526 N.W.2d 132, 134 (Wis.1994). As the Wisconsin Supreme Court has explained:

> A later and an older statute will, if it is possible and reasonable to do so, be always construed together, so as to give effect not only to the distinct parts or provisions of the latter, not inconsistent with the new law, but to give effect to the older law as a whole, subject only to restrictions or modifications of its meaning, where such seems to have been the legislative purpose.

*Jicha v. Karns*, 39 Wis.2d 676, 159 N.W.2d 691, 693 (Wis.1968) (quoting *McLoughlin v. Malnar*, 237 Wis. 492, 297 N.W. 370 (Wis.1941) (internal citations omitted)). Thus, we must make every attempt to give effect to both provisions by construing them together so as to be consistent with one another. However, an earlier statute, or provision in such a statute, will not be considered to remain in force if it is so "manifestly inconsistent and repugnant to the later act that they cannot reasonably stand together." *Cross v. Soderbeck*, 94 Wis.2d 331, 288 N.W.2d 779, 784 (Wis. 1980) (quoting *Lenfesty v. Eau Claire*, 245 Wis. 220, 13 N.W.2d 903, 906 (Wis.1944)).

In determining whether the parental consent law has been impliedly repealed, we must first consider whether there is any way to construe the two medical emergency provisions so as not to conflict with one another. *Jicha*, 159 N.W.2d at 693. The only rational construction that would allow both provisions to survive is one in which AB 441's medical emergency provision is construed to set forth the standard imposed on physicians performing emergency abortions on adult women and the parental consent law's medical emergency provision establishes the standard imposed on physicians performing emergency abortions on minor women. Such a construction, however, would ignore the plain wording of both statutes and is inconsistent with the legislature's professed intent in promulgating AB 441, which we explain below.

■ Whenever a court is confronted with apparently conflicting legislation, its goal is to ascertain the intent of the legislative body and construe the law accordingly. *See County of Columbia v. Bylewski*, 94 Wis.2d 153, 288 N.W.2d 129, 135 (Wis.1980). In determining the legislature's intent in enacting AB 441, our first resort is to the language of the statute itself. *See State v. Consolidated Freightways Corp.*, 72 Wis.2d 727, 242 N.W.2d 192, 197 (Wis.1976). AB 441 makes clear that its provisions were to reach *all* women considering an abortion, both minors and adults. *See, e.g.,* Wis. Stat. § 253.10(1)(b)(4) (stating that it is the intent of the legislature to ensure "that a woman who decides to have an elective abortion gives her voluntary and informed consent to the abortion procedure."); *id.* § 253.10(1)(b)1 (stating that it is the intent of the legislature to protect "the life and health of the woman subject to an elective abortion and, to the extent constitutionally permissible, the life of her unborn child."). Nowhere in AB 441 is it provided that certain provisions do not apply, or need not be complied with, if the woman is a minor. To the contrary, AB 441 provides that certain *additional* conditions must be fulfilled in order to perform an abortion on a minor—the physician must obtain not only the voluntary and informed consent of the minor woman but also the voluntary and informed consent of her parent or parent substitute *under the requirements of AB 441. See id.* § 253.10(3)(a). AB 441 does not indicate that its informed consent requirements would be satisfied if the physician only obtained the parent's consent

under the requirements of § 48.375. Rather, AB 441 provides that if the woman is a minor, the person who would be required to give consent under the parental consent law must also give consent under the requirements of AB 441. *See id.*

AB 441 also makes clear that physicians are expected to exercise "reasonable medical judgment" in determining whether to perform an emergency abortion on all women—not just those situations involving adult women. The legislature explicitly expressed that one of its intentions in enacting AB 441 was to foster "the development of standards of professional conduct in the practice of abortion." *Id.* § 253(10)(1)(b)2. The medical emergency provision specifically employs the term "pregnant woman" not pregnant adult woman or pregnant non-minor woman. Given that the legislature sought to hold physicians to a higher standard of care under AB 441 by imposing an objective rather than subjective standard on their emergency medical decisions, we find it difficult to imagine that the legislature intended a different standard to apply to minors' abortions absent some indication in AB 441 that the objective standard was not to apply to minors.

We conclude that the legislature intended the objective standard contained in AB 441's medical emergency provision to apply to all women—adults and minors alike. As such, we cannot ignore the fact that AB 441's objective standard is manifestly inconsistent with the subjective standard found in the parental consent law's medical emergency provision. Because "[i]t is a standard rule of construction that when two statutes are manifestly in conflict the earlier statute[ ] will be repealed by implication and the last one enacted will be controlling," *State v. Gurnoe*, 53 Wis.2d 390, 192 N.W.2d 892, 899 (Wis.1972), we hold that the medical emergency provision of the parental consent law, Wis. Stat. § 48.374(5)(b)1, is impliedly repealed in favor of AB 441's medical emergency definition, Wis. Stat. § 253.10(2)(d).

## C. Informational Requirements

Plaintiffs next contend that the informed consent requirements of AB 441 set forth in sections 253.10(3)(c)1 and 253.10(3)(c)2 are unconstitutionally vague because they require a physician to convey information to a woman seeking an abortion without adequately identifying the exact content of what needs to be conveyed in order to comply with AB 441 and avoid prosecution. Plaintiffs argue that AB 441's informed consent requirements fail to provide them with "fair warning" as to what conduct will subject them to liability under the statute.

 To illustrate their allegations of vagueness, plaintiffs submit that AB 441 requires a physician to inform a woman seeking an abortion of the "probable gestational age" of the fetus, the "probable anatomical and physiological characteristics" of the fetus, and the "medical risks" associated with abortion including the risk of "psychological trauma" and any "danger to subsequent pregnancies." *See* Wis. Stat. §§ 253.10(3)(c)1.b, d, f. Plaintiffs argue that physicians have no way of knowing whether their descriptions of the "probable" characteristics of the fetus are adequate or accurate enough to avoid liability under AB 441. Similarly, plaintiffs argue that physicians may differ in their medical judgments about the nature and extent of the risk that an abortion poses to subsequent pregnancies and whether there is any risk of psychological trauma from abortion. Without some sort of good faith standard or scienter requirement, plaintiffs contend that physicians can be held strictly liable under AB 441 despite communicating their best medical judgments to their patients regarding the information AB 441 requires them to discuss because they can be continually second-guessed by prosecutors who would have little difficulty in finding a physician to offer a different assessment. Furthermore, plaintiffs submit that in an area such as this, where professional medical judgments may differ, the Constitution requires a higher degree

of precision in giving physicians "fair warning" of what conduct is expected of them, and, without some standard defining the content of what needs to be disclosed under AB 441, the informed consent requirements must be found void for vagueness.[12]

It is quite surprising that plaintiffs are raising this vagueness challenge on appeal because the district court construed AB 441's informed consent requirements in a manner that remedies their vagueness concerns. In the proceedings below, plaintiffs raised the same vagueness challenge to AB 441's informed consent requirements. The district court focused on plaintiffs' challenge to AB 441's requirement that physicians discuss with their patients the risk of psychological trauma an abortion can inflict on a woman. The evidence offered at trial showed that physicians disagreed over whether a woman who undergoes an abortion is at risk of suffering some level of psychological trauma. The district court concluded, however, that the fact that physicians may disagree over the nature and extent of the medical risks that AB 441 requires them to discuss with their patients does not render the informed con-

sent requirements void for vagueness. Instead, the court reasoned that:

> If doctors discuss the risks on the basis of their medical training and experience, they have no legitimate fear of prosecution. This means that if a physician believes that no psychological trauma is associated with the abortion procedure to be used, that is what the statute requires him or her to tell the patient. The legislature did not specify the exact details of the risks to be discussed. It left that determination to the individual doctors. *Having done so, it has created no risk of prosecution for doctors who explain the medical risks of abortion in conformance with their own best medical judgment.*

*Karlin,* 975 F.Supp. at 1227 (emphasis added).

Thus, the district court construed the informed consent requirements in the manner that plaintiffs asserted was necessary in order to avoid vagueness. The court specifically concluded that a physician who relies on his or her "best medical judgment" in conveying the information that needs to be disclosed under the informed consent requirements will not be subject to prosecution or liability—a con-

---

**12.** Plaintiffs also assert that AB 441's informed consent requirements impose an undue burden on a woman's right to abortion because AB 441's vagueness will have a chilling effect on a physician's willingness to provide abortions. In other words, because AB 441 is vague, it operates to impose an undue burden. However, because we conclude that AB 441's informed consent requirements are not vague, and because plaintiffs offer nothing more than the mere assertion that vagueness causes the undue burden, we necessarily reject plaintiffs' contention that the informed consent requirements as a whole impose an undue burden on a woman's right to abortion.

Notwithstanding this point, as we explain *infra, Casey* held that as long as the information required to be conveyed under an abortion informed consent statute is "truthful and not misleading," the requirement will not be found to impose an undue burden on a woman's abortion right. 505 U.S. at 882, 112 S.Ct. 2791. The state has a legitimate and substantial interest in ensuring that a woman

be apprised of the health risks of abortion and childbirth. *Id.* Furthermore, the state also has a legitimate interest in protecting the life of the fetus, and the state, under *Casey,* can constitutionally require doctors to inform a woman seeking an abortion of information relating to the fetus, and the consequences of the abortion on the fetus, even when that information has no direct relation to the mother's health. *Id.* at 882–83, 112 S.Ct. 2791; *see also Doyle,* 162 F.3d at 467 (recognizing that a state "may adopt measures that, while not preventing the pregnant woman from deciding whether to have an abortion, remind her of the gravity of the choice and the value of fetal life").

Aside from the fetal auscultation information requirement, *see* Wis. Stat. § 253.10(3)(c)1.g, which we address in more detail below, plaintiffs raise no argument on appeal that the information they are asked to convey is false and misleading. Accordingly, plaintiffs' contention that the information requirements impose an undue burden under *Casey* is without merit.

clusion with which we agree. Accordingly, physicians are no longer left guessing as to what information needs to be conveyed under the requirements in order to avoid prosecution. While AB 441 does strictly require that physicians must provide their patients with information on a number of specific topics, the district court's interpretation of the informed consent requirements allows the physician to use his or her best medical judgment in determining the exact nature or content of that information. For example, as the district court noted, a physician is required to inform the patient of the medical risks associated with her abortion procedure including, among other risks, the risk of psychological trauma, even if it is only to indicate that the physician believes that no psychological trauma is likely to result from the abortion procedure. Provided the basis for this belief is the physician's best medical judgment based on the physician's training and experience, as opposed to some bad faith attempt to circumvent AB 441's informed consent requirements, a physician faces no fear of prosecution even if another physician disagrees with the existence of or extent of the risk of psychological trauma. Similarly, plaintiffs' complaint that physicians have no way of knowing whether their descriptions of the "probable" anatomical and physiological characteristics of the fetus are adequate or accurate enough to escape prosecution is equally flawed under the district court's construction because physicians face no risk of prosecution if the information they convey is based on their best medical judgment.

In sum, we agree with the district court's construction that a physician may rely on his or her "best medical judgment" in determining the content of the information that needs to be disclosed under AB 441's informed consent requirements. Although the court discussed this standard only in the context of the provision of information on the risk of psychological trauma under § 253.10(3)(c)1.f, we see no reason why this standard should not be applicable to AB 441's other informed consent requirements as well.[13] Furthermore, we conclude that this standard provides fair warning of the conduct expected of physicians and is more than adequate to protect against any arbitrary enforcement of AB 441 by state officials.

Although the district court construed the informed consent requirements in a manner that plaintiffs argued was necessary in order to avoid being found unconstitutionally vague, plaintiffs now contend that the district court exceeded its authority by construing AB 441 in this manner. Plaintiffs argue that AB 441 is not "readily susceptible" to the court's construction because it imposes strict liability for violations of its provisions but provides "no leeway for honest mistakes." Plaintiffs submit that a statute that leaves no leeway for honest mistakes is not "readily susceptible" to a construction that allows physicians to rely on their best medical judgment in conveying the information that needs to be disclosed.

Plaintiffs' argument falls short of its mark because plaintiffs have confused the circumstances under which AB 441

---

13. Accordingly, we hold that this standard applies to all of the informed consent requirements contained in Wis. Stat. §§ 253.10(3)(c)1, 2, except for the following three provisions: § 253.10(3)(c)1.j; § 253.10(3)(c)1.a; and § 253.10(3)(c)1.i. The requirement that a physician inform a woman of "any other information a reasonable patient would consider material and relevant" to the abortion decision, *see id.* § 253.10(3)(c)1.j, was found to be impermissibly vague by the district court, and defendants did not appeal this decision.

The "best medical judgment" standard does not apply to the remaining two provisions because both already contain an ascertainable standard—the same "reasonable medical judgment" standard that we have already held is not vague in the abortion context. *See id.* § 253.10(3)(c)1.a ("Whether or not, according to the reasonable medical judgment of the physician, the woman is pregnant."); *id.* § 253.10(3)(c)1.i ("If, in the reasonable medical judgment of the physician, the woman's unborn child has reached viability . . .").

purports to impose strict forfeiture liability for honest mistakes. As construed by the district court, AB 441 provides that a physician is subject to liability with respect to the content of the information conveyed under the informed consent requirements only if the physician fails to employ his best medical judgment. By contrast, AB 441 holds a physician strictly liable if the physician omits any of the designated topics identified in § 253.10(3)(c) from his informed consent discussion with the patient, even if the omission is inadvertent. We believe that two separate inquiries must be undertaken in order to unpack plaintiffs' challenge to the district court's construction. First, we must determine whether AB 441's informed consent requirements are "readily susceptible" to the district court's construction that physicians may exercise their "best medical judgment" in determining what information to provide patients within the specified topics. Second, if AB 441 is readily susceptible to such an interpretation, we must then determine whether it is constitutional to hold a physician strictly liable for an inadvertent failure to address one of the statutorily proscribed topics.

### 1. *AB 441 Is Readily Susceptible To The District Court's Construction*

 Under Wisconsin law, before a court can conclude that a challenged statute is void for vagueness, it must first determine whether the statute can be "construed so as to avoid constitutional objections." *State v. Fry,* 131 Wis.2d 153, 388 N.W.2d 565, 570 (Wis.1986) (citation omitted); *see also Baird v. La Follette,* 72 Wis.2d 1, 239 N.W.2d 536, 538 (Wis.1976) ("Where there is serious doubt of constitutionality, we must look to see whether there is a construction of the statute which is reasonably possible which will avoid the constitutional question."). "[I]n determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *State v. Thiel,* 183 Wis.2d 505, 515 N.W.2d 847, 858 (Wis. 1994) (quoting *Virginia v. American Booksellers Ass'n.,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (citation omitted)). However, while a federal court may construe a state statute in a manner that saves it against constitutional attack if the statute is "readily susceptible" to the construction, the court cannot "slice and dice a state law to 'save' it; we must apply the Constitution to the law the state enacted and not attribute to the state a law we could have written to avoid the problem." *K–S Pharmacies,* 962 F.2d at 730; *see also State v. Hall,* 207 Wis.2d 54, 557 N.W.2d 778, 789 (Wis.1997) ("Although this court will strive to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute.").

 We conclude that AB 441 is readily susceptible to the district court's construction that physicians may rely on their "best medical judgment" in determining the content of the information to be conveyed to the patient on specified topics. First, one of the overarching purposes of AB 441, and the purpose most pertinent to the district court's construction, is to ensure that, prior to the abortion, a woman considering an abortion receive "a full range of information regarding her pregnancy, her unborn child, the abortion, the medical and psychological risks of abortion and available alternatives to the abortion." Wis. Stat. § 253.10(1)(b)3. The district court's construction in no way perverts this purpose.

Second, plaintiffs do not offer much in the way of support for their argument that AB 441 is not "readily susceptible" to the district court's construction except to quibble over minor aspects of the AB 441's informed consent requirements that plaintiffs contend unfairly subject them to the threat of forfeiture liability. Plaintiffs contend that AB 441 sets qualitative conditions on the content of the topics which

make the statute not readily susceptible to the court's construction that the legislature intended to give physicians a free hand in determining what information to convey on the proscribed topics. For example, plaintiffs argue that physicians are directed to describe, not just the gestational age of the fetus, but the "probable" gestational age of the fetus. Plaintiffs submit that the district court's implicit position that AB 441 dictates solely the topics to be covered conflicts with the plain language of the statute and, therefore, AB 441 is not readily susceptible to the court's construction.

 Plaintiffs' attempts to inject uncertainty into AB 441 at all costs fails to persuade us that AB 441 is not "readily susceptible" to the district court's construction. In order to define a list of topics that a physician must address with a patient, AB 441 must necessarily describe those topics with some specificity. In so doing, we must recognize that "there are limitations in the English language with respect to being both specific and manageably brief," *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL–CIO,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language," *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. Quite frankly, we fail to understand how modifying the gestational age of a fetus with the term "probable" makes AB 441 any less susceptible to the district court's construction that a physician may use his "best medical judgment" in determining the fetus's gestational age. Furthermore, we re-emphasize that plaintiffs appear to misunderstand the effect of the district court's construction. Physicians cannot be held liable under AB 441 because prosecutors may disagree with the information conveyed to a woman on a certain topic. Notwithstanding a physician's failure to address a required topic, a physician is liable under AB 441's informed consent requirements only if he fails to convey his best medical judgment on the information those requirements direct him or her to discuss with the patient.

Finally, the district court's construction that a physician is entitled to use his best medical judgment in determining the content of the information to be conveyed does not amount to a re-writing of AB 441, but rather flows naturally from the informed consent requirements themselves. As we indicated above, two of the requirements provide that the information conveyed is subject to the "reasonable medical judgment of the physician." *See* Wis. Stat. § 253.10(3)(c)1.a ("Whether or not, according to the reasonable medical judgment of the physician, the woman is pregnant."); *id.* § 253.10(3)(c)1.i ("If, in the reasonable medical judgment of the physician, the woman's unborn child has reached viability . . ."). By implication, the Wisconsin legislature must have intended that some other standard apply to the provision of information under AB 441's remaining informed consent requirements. Since AB 441 explicitly provides when the content of the information required to be conveyed will be subject to an objective standard, we believe AB 441 is "readily susceptible" to the district court's construction that remaining information is subject to the physician's "best medical judgment"—a subjective standard. The district court's construction was more or less the articulation of a residual standard that was already implicit in AB 441's informed consent requirements.

### 2. The Imposition of Strict Liability Does Not Render AB 441 Unconstitutionally Vague

 Plaintiffs argue that the information requirements are unconstitutionally vague because a physician is subject to strict forfeiture liability for an inadvertent failure to address one of the statutorily proscribed topics. While statutes imposing strict criminal liability without a scienter requirement are generally disfavored, *see Staples,* 511 U.S. at 605–06, 114 S.Ct. 1793, it is equally well-established that a

criminal statute is not necessarily rendered unconstitutional because the legislature chose not to include the intent to violate the statute or regulation as an element of the crime. *See Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) ("We do not go with Blackstone in saying that 'a vicious will' is necessary to constitute a crime ... for conduct alone without regard to the intent of the doer is often sufficient. There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition.") (citations omitted); *Williams v. North Carolina*, 325 U.S. 226, 238, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) ("The objection that punishment of a person for an act as a crime when ignorant of the facts making it so, involves a denial of due process of law has more than once been overruled."). In fact, the Supreme Court has recognized the propriety of strict liability without any element of scienter in statutes that are "regulatory" in nature or designed to protect the "public welfare." *See Morissette v. United States*, 342 U.S. 246, 255–60, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In *Morissette*, the Supreme Court explained the rationale for the imposition of strict civil or criminal liability in cases involving public welfare or regulatory offenses:

> [C]ases [involving public welfare or regulatory offenses] do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as of-

fenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect,. whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

*Id.* at 255–56, 72 S.Ct. 240.

█ Similarly, under Wisconsin law, it is permissible to impose strict liability without a finding of fault in regulatory criminal statutes. *See State v. Collova*, 79 Wis.2d 473, 255 N.W.2d 581, 584–85 (Wis. 1977); *see also State v. Stepniewski*, 105 Wis.2d 261, 314 N.W.2d 98, 102 (Wis.1982). In *Collova*, the Wisconsin Supreme Court explained its justification for the imposition of strict criminal liability in "regulatory" statutes:

> [R]egulatory statutes are concerned primarily with the protection of social and public interests, with the prevention of direct and widespread social injury. They are more concerned with the injurious conduct than with the question of individual guilt or moral culpability. The penalties imposed are generally light. The usual rationale for strict liability statutes is that the public interest is so great as to warrant the imposition of an absolute standard of care—the de-

fendant can have no excuse for disobeying the law.

255 N.W.2d at 585. The purpose of such enactments is often to impose and enforce a high standard of care upon individuals or organizations who have assumed certain responsibilities *vis a vis* the public at large. To this end, Wisconsin often imposes liability without an explicit scienter requirement in statutes such as AB 441 that regulate the activities of health care professionals. *See e.g.,* Wis. Stat. § 253.11 (subjecting a physician or nurse-midwife who fails to use a prophylactic agent to prevent infant blindness to a fine of up to $1000); *id.* § 447.09 (subjecting a person who violates any provision of Wisconsin regulations governing the licensing and practice of dentistry to a fine of up to $1000 and/or imprisonment of up to one year for the first offense and $2500 and/or imprisonment of up to two years for subsequent offenses); *id.* § 448.09(1) (subjecting a person who violates any provision of the Wisconsin regulation governing the licensing and practice of medicine to a fine of up to $10,000 and/or imprisonment of up to nine months); *id.* § 448.59 (subjecting a person who violates any provision of Wisconsin regulations governing the licensing and practice of physical therapy to a fine of up to $10,000 and/or imprisonment of up to nine months).

By imposing strict forfeiture liability upon physicians who fail to cover the required topics, AB 441 seeks to enforce a high standard of conduct designed to protect both women seeking an abortion and, to the extent constitutionally permissible, the life of the fetus. Given the state's legitimate interest in ensuring that a woman's decision to chose an abortion is informed, it is perfectly reasonable for the Wisconsin legislature to hold physicians strictly liable in order to encourage physicians to take care that a woman receives, at a minimum, all the information that the legislature has deemed necessary to make an informed and mature decision. Furthermore, strict forfeiture liability for inadvertent failures to address certain topics required by AB 441's informed consent requirements can be avoided with a minimum amount of care. A physician "is in a position to prevent [the offense] with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Morissette,* 342 U.S. at 256, 72 S.Ct. 240.

Physicians are highly trained and intelligent individuals. Requiring them to discuss a list of clearly prescribed topics with a patient is simply not that difficult of a task especially when AB 441 clearly identifies the topics that need be discussed. We expect that with a minimum amount of diligence, a physician will have no difficulty in complying with AB 441's informed consent requirements.

In addition, the severity of the penalty under AB 441's forfeiture provision militates against a finding that AB 441 is unconstitutional. The forfeiture provision of AB 441 merely levels a monetary fine for violations—there is no risk of incarceration nor is a violator labeled with the stigma of having been convicted of a misdemeanor or felony offense. *Cf. Stepniewski v. Gagnon,* 732 F.2d 567, 570–73 (7th Cir.1984) (affirming Wisconsin strict liability crime that subjected a defendant to fines of up to $5000 and/or imprisonment of up to one year for home improvement trade practices violations); *see also United States v. Freed,* 401 U.S. 601, 607–10, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (affirming the constitutionality of strict liability crime that subjected a defendant to fines of up to $10,000 and/or imprisonment up to ten years for the possession of an unregistered firearm); *United States v. Dotterweich,* 320 U.S. 277, 279–85, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (upholding constitutionality of a strict liability crime that subjected a defendant to a misdemeanor offense calling for a fine of up to $1000 and/or imprisonment of up to one year for the first offense).

Given the state's legitimate interest in ensuring that a woman's decision to chose an abortion is informed, we conclude that AB 441's strict forfeiture liability does not render the statute unconstitutionally vague.

## IV. UNDUE BURDEN ANALYSIS

### A. Legal Framework Governing Abortion Regulations

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that a pregnant woman has a constitutional right under the Due Process Clause of the Fourteenth Amendment to choose whether to continue or terminate her pregnancy before viability. *Id.* at 153–54, 93 S.Ct. 705. At the same time, however, the Court recognized that a woman's right to an abortion is neither absolute nor unqualified. Rather, a woman's right to decide whether to terminate her pregnancy must be balanced against the state's important and legitimate interest in protecting both the life and health of the pregnant woman and the potential life of the fetus. *Id.* at 162–63, 93 S.Ct. 705.

The Court attempted to balance these interests in *Roe* by employing a trimester framework to assess the constitutionality of abortion regulations. During the first trimester, the Court held that a woman's right to choose to terminate her pregnancy may be freely exercised without any interference or regulation by the state. During the second trimester, when the state's interest in protecting the health of the mother becomes stronger, the state may regulate abortions but only in ways that were reasonably related to maternal health. Finally, during the third trimester, when the state's interest in protecting the life of the fetus becomes compelling, the state may regulate and even prohibit post-viability abortions except where necessary to preserve the life or health of the mother. *Id.* at 163–65, 93 S.Ct. 705.

The Court revisited *Roe* in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), in which the Court considered a constitutional challenge to Pennsylvania's abortion informed consent statute. In *Casey,* a plurality of the Court reaffirmed the central holding of *Roe,* which the Court identified as consisting of three essential parts.[14] First, a woman has a constitutional right to choose to have an abortion prior to viability without any undue interference from the state. Second, the state has the power to restrict abortions after viability provided such regulation contains an exception for pregnancies that endanger the woman's health or life. Third, the state has a legitimate interest from the outset of a woman's pregnancy in protecting both the health of the mother and the life of the fetus. *Id.* at 846, 112 S.Ct. 2791.

Although the Court reaffirmed the central principles of *Roe* in *Casey,* the Court abandoned *Roe*'s rigid trimester framework because it had the effect of undervaluing the state's legitimate interest in promoting the potential life within the woman by prohibiting all pre-viability regulation aimed at the protection of fetal life. *Id.* at 872–876, 112 S.Ct. 2791. Under the trimester framework, the Court reasoned, state abortion regulations designed to ensure that a woman's choice was informed could be struck down even though they were consistent with *Roe*'s recognition that states have a legitimate interest in promoting prenatal life. *Id.* at 873, 112 S.Ct. 2791. As the Court observed:

> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, the State

---

14. Although only three Justices of the Court joined in the lead *Casey* opinion, under *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), it is the holding of the Court.

may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. [T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth. It follows that States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning. This, too, we find consistent with *Roe*'s central premises, and indeed the inevitable consequence of our holding that the State has an interest in protecting the life of the unborn.

*Id.* at 872–73, 112 S.Ct. 2791 (internal quotation marks and citation omitted). The Court reasoned that state regulations designed to ensure that a woman's choice contemplated consequences for the fetus did not necessarily interfere with a woman's abortion right recognized in *Roe*, although such measures often had previously been found to be inconsistent with *Roe*'s rigid trimester framework. *Id.* at 873, 112 S.Ct. 2791. The Court concluded that the trimester framework had the improper effect of invalidating legitimate governmental attempts to regulate pre-viability abortions and this effect was "incompatible with the recognition that there is a substantial state interest in potential life throughout pregnancy." *Id.* at 876, 112 S.Ct. 2791.

■ In its place, the Court adopted the "undue burden" standard which the Court viewed as the appropriate means of reconciling the state's interests with the woman's constitutionally protected right to choose abortion. *Id.* at 876, 112 S.Ct. 2791. Under this standard, a state abortion regulation is unconstitutional only if

its places an "undue burden" on the exercise of a woman's right to abortion. "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 878, 112 S.Ct. 2791.

■ After *Casey*, states may constitutionally enact pre-viability abortion regulations, such as AB 441, to ensure that a woman's consent is informed so long as such regulations do not place an "undue burden" on a woman's right to terminate her pregnancy. As the Court observed in *Casey*:

What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.... Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal.

505 U.S. at 877–78, 112 S.Ct. 2791. Although all pre-viability regulations burden a woman's ability to obtain an abortion to some degree, the Court explained that an abortion law is not rendered unconstitutional merely because it operates to make it more difficult or more expensive to procure an abortion. *Id.* at 874, 112 S.Ct. 2791. A woman's right to an abortion, the Court reasoned, is not the right "to decide whether to have an abortion 'without interference from the State,'" *id.* at 875, 112 S.Ct. 2791 (quoting *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 61, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)), rather it is the "right 'to be free from unwarranted governmental intrusion ...'" *id.* at 875, 112 S.Ct. 2791 (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 31

L.Ed.2d 349 (1972)), in making the abortion decision. Thus, "[o]nly where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id.* at 874, 112 S.Ct. 2791.

So, after *Casey,* it is clear that a court faced with a facial constitutional challenge to a previability abortion regulation must undertake an examination to determine whether the challenged regulation imposes an "undue burden" on a woman's abortion right. The difficulty lies, however, in determining what exactly is meant by an "undue" burden. When is a burden "undue" as opposed to merely incidental? The Court answered this question by explaining its "undue burden" concept as follows:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.* at 877, 112 S.Ct. 2791.

Although this description serves as a useful guide to a court in considering the constitutionality of an abortion regulation, the undue burden test is perhaps best understood by examining the Court's application of it in *Casey.* At issue in *Casey* were facial constitutional challenges to five provisions of Pennsylvania's Abortion Control Act: (1) the informed consent provision; (2) the twenty-four hour waiting period requirement; (3) the medical emergency exception to the twenty-four

hour waiting period; (4) the provision requiring parental consent for a minor's abortion; and (5) the spousal notification provision. The statute's informed consent provision required that at least twenty-four hours before performing an abortion a physician must inform the woman of the nature of the abortion procedure, the risks of and alternatives to abortion, the medical risks of childbirth, and the probable gestational age of the fetus. In addition, abortion providers were required to make available certain state-printed materials describing the fetus and providing information about medical assistance for childbirth, liability of the father for child support, and adoption and other alternatives to abortion. The parental consent provision required a physician to obtain both the informed consent of a minor seeking an abortion and the informed consent of at least one of her parents. Under the statute's spousal notification provision, a married woman seeking an abortion was required to sign a statement indicating that her spouse had been notified of her intent to undergo an abortion. The statute also contained a medical emergency exception which excused compliance from the three previous provisions and allowed for an immediate abortion. Finally, the statute imposed various reporting requirements on physicians and abortion facilities. The Court upheld all of the challenged provisions identified above except for the spousal notification provision.

The Court's analysis in striking down the spousal notification provision most clearly demonstrates what type of showing is necessary in order to satisfy a court that a facially challenged provision places an undue burden on a woman's abortion right. The Court concluded that the spousal notification provision placed an undue burden on a woman's right to abortion because it would have the effect of preventing a significant number of women from obtaining an abortion. *Id.* at 887–895, 112 S.Ct. 2791. In reaching this determination, the Court relied on the district court's exten-

sive findings of fact and a number of studies and other literature that indicated that some women would be subjected to physical and psychological abuse by their spouses if they were forced to notify the spouse that they were contemplating an abortion. *See id.* Based on this evidence, the Court concluded that many women have justifiable fears that notifying their spouses of their intent to have an abortion will subject them to abuse and these fears meant that the spousal notification law was:

> likely to prevent a significant number of women from obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle. We must not blind ourselves to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases.

*Id.* at 893–94, 112 S.Ct. 2791. The Court reached this conclusion even though the spousal notification provision imposed almost no burden on the vast majority of women seeking abortions. In fact, the Court noted that only about one percent of the women who sought abortions would be affected. Nevertheless, the Court stated that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894, 112 S.Ct. 2791. The Court found that the adverse consequences of the spousal notification provision on the one percent of the women for whom the provision was actually relevant operated as a substantial obstacle to a woman's choice to undergo an abortion and, hence, placed an undue burden on a woman's right to an abortion. *Id.* at 894–95, 112 S.Ct. 2791.

██ It is clear from the Court's application of the undue burden standard to the spousal notification law that courts should not focus on whether the challenged regulation merely has the effect of making abortions a little more difficult or expensive to obtain. As the district court aptly noted, inconvenience, even severe inconvenience, is not an undue burden. See *Karlin*, 975 F.Supp. at 1205. Instead, a court's proper focus must be on the practical impact of the challenged regulation and whether it will have the likely effect of preventing a significant number of women for whom the regulation is relevant from obtaining abortions. This application of the undue burden test explains why the Court held that the twenty-four hour waiting period did not impose an undue burden.

The Court's undue burden analysis of the waiting period was two-fold: (1) whether the waiting period requirement was reasonably related to a legitimate state interest and (2) whether the waiting period had the practical effect of imposing an undue burden. *Id.* at 885–87, 112 S.Ct. 2791. The Court first concluded that the waiting period was a reasonable measure to effectuate the state's interest in protecting the life of the fetus; a measure the court determined did not amount to an undue burden. *Id.* at 885, 112 S.Ct. 2791. "The idea that important decisions will be more informed and deliberate if they follow some period of reflection does not strike us as unreasonable, particularly where the statute directs that important information become part of the background of the decision." *Id.*

The Court then looked to whether the mandatory waiting period was nonetheless invalid because in practice it created a substantial obstacle to a woman's choice to terminate her pregnancy. *Id.* The district court in *Casey* found that because of the distances many women must travel to reach an abortion provider, the waiting period would require most women seeking an abortion to make two trips to the doctor. *Id.* at 885–86, 112 S.Ct. 2791. As a result, the district court found that waiting period would be particularly burdensome to those women who have the fewest financial resources, those who have

to travel the longest distances to reach an abortion provider, and those who had problems explaining their absences to spouses or employers. *Id.* at 886, 112 S.Ct. 2791. In addition, the second trip would increase the exposure of women to harassment from anti-abortion protesters. *Id.* While the Court acknowledged that the waiting period did operate to impose some burden on these women by making it more difficult and expensive to obtain an abortion, it was not convinced that the waiting period amounted to a substantial obstacle even for those women most burdened by it. *Id.* at 886–87, 112 S.Ct. 2791. Accordingly, the Court concluded that the waiting period did not constitute an "undue burden."

It is clear from *Casey's* application of the undue burden standard to these two provisions, that to constitute an undue burden, a challenged state regulation must have a strong likelihood of *preventing* women from obtaining abortions rather than merely making abortions more difficult to obtain. "[U]nder the undue burden standard a State is permitted to enact *persuasive* measures which favor childbirth over abortion, even if those measures do not further a health interest." *Id.* at 886, 112 S.Ct. 2791 (emphasis added). By drawing the constitutional line at persuasion, the undue burden standard should not invalidate those state regulations designed to persuade a woman to carry her fetus to term, even though those regulations may incidentally burden the woman's abortion right by making an abortion more expensive or inconvenient to obtain; however, when those regulations actually prevent women from having abortions they would otherwise choose to have, then they pose an unconstitutional undue burden.

In the present case, plaintiffs challenge a number of AB 441's provisions on the ground that they impose an unconstitutional undue burden on a woman's right to an abortion. Plaintiffs challenge two aspects of AB 441 that they allege have the "effect" of placing a substantial obstacle in the path of a Wisconsin woman seeking an abortion. First, plaintiffs assert that AB 441's requirement that women meet face-to-face with an abortion provider at least twenty-four hours before the abortion procedure will pose an undue burden on a woman because it will have the effect of causing some women to have later abortions, some to leave the state to obtain abortions elsewhere, and will preclude still other women from obtaining abortions altogether. Second, plaintiffs argue that AB 441 unduly burdens a woman's access to abortion services because it fails to provide a mental health exception for situations in which providing the woman with the required informed consent information will be psychologically harmful to the woman. Plaintiffs also argue that the Wisconsin legislature passed AB 441 with the impermissible "purpose" of making it more difficult for women to obtain abortions in Wisconsin. In his cross appeal, defendant McCann challenges the district court's ruling that Wis. Stat. § 253.10(3)(c)1.g, which requires a physician to inform his or her patient that services are available to allow her to view the image of or hear the heartbeat of her unborn child, poses an undue burden because the information required to be conveyed is false and misleading, arguing that the provision is constitutional when read with common sense.

## B. Standard Of Proof For Facial Challenges To State Abortion Regulations

Prior to *Casey,* in order to prevail on a facial challenge to a statute, the challenger had to "establish that no set of circumstances exists under which the [statute] would be valid." *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The fact that the statute "might operate unconstitutionally under some conceivable set of circumstances [was] insufficient to render it wholly invalid." *Id.* Under the so-called *Salerno* standard, a facial challenge to a

statute would fail if the statute had some constitutional application.

In *Casey*, the Court appears to have tempered, if not rejected, *Salerno*'s stringent "no set of circumstances" standard in the abortion context, without expressly saying so. The plurality opinion in *Casey* indicated that an abortion regulation is facially invalid if "in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. at 895, 112 S.Ct. 2791. This analysis is plainly inconsistent with the standard set forth in *Salerno* and has led to considerable disagreement among the individual Justices of the Court, as well as lower federal courts, regarding the continued vitality of *Salerno* in the abortion context. *See Voinovich*, 130 F.3d at 193–197 (setting out in detail the conflicting post-*Casey* statements made by individual Justices on the applicability of *Salerno* in the abortion context and surveying the split among the circuits); *see also Karlin*, 975 F.Supp. at 1202–04 (same).

The district court evaluated plaintiffs' facial challenges under the less stringent *Casey* standard. We have not yet had occasion to pass on the proper standard for reviewing facial challenges to an abortion statute in light of *Casey;* however, neither party has appealed the district court's use of the *Casey* standard. For purposes of this appeal, we will assume that the standard set forth in *Casey* ap-

plies. We do note, however, that the application of the *Salerno* standard would not have affected the outcome of any of the challenges raised on appeal.

## C. Plaintiffs' Effect–Based Challenges

### 1. *Twenty–Four Hour Waiting Period*

■ Plaintiffs contend that the district court erred in concluding that AB 441's twenty-four hour waiting requirement will not place an undue burden on a woman's right to an abortion even though it necessitates that, in practice, a woman will have to make two visits to an abortion facility in order to obtain an abortion.[15] *See* Wis. Stat. §§ 253.10(3)(c)1, 2. Plaintiffs submit that the requirement of a face-to-face meeting between the attending physician and the woman twenty-four hours before the abortion procedure would create a substantial obstacle to abortion services in the form of increased costs for travel, lodging, and child care, loss of confidentiality for women who are closely monitored and controlled by abusive partners, and delays that are in actuality longer than twenty-four hours because of the limited number of physicians performing abortions in Wisconsin.

The arguments raised by plaintiffs in the instant case are substantially the same as those raised by the plaintiffs in *Casey* and subsequently rejected by the Supreme Court. In *Casey*, the Court concluded that a virtually identical twenty-four hour wait-

---

15. Defendants argued before the district court that AB 441 does not require that a woman make two trips to an abortion provider because the statute allows women to receive the required informed consent information from a "qualified physician." *See* Wis. Stat. § 253.10(3)(c)1; *see also id.* § 253.10(2)(g) (" 'Qualified physician' means a physician who by training or experience is qualified to provide the informed consent information . . ."). Defendants asserted that there would be physicians "qualified" to give this information in most every county in the state, thereby negating the need for a woman to make two trips to an abortion provider.

 The district court found, however, that as a practical matter AB 441 likely will require

two trips to an abortion provider because the "qualified physician" definition is too unclear as to how exactly a physician becomes "qualified." The court concluded that AB 441's enforcement mechanisms were severe enough to discourage abortion providers from relying on other physicians to convey the required informed consent information because they would be uncertain that those physicians met the statutory standard of a "qualified physician." For purposes of this appeal, and because it will not affect our ultimate determination as to whether AB 441's waiting period operates to impose an undue burden on Wisconsin women, we assume that AB 441 would require two trips to an abortion provider.

ing period requirement in Pennsylvania's abortion statute did not have the effect of placing a substantial obstacle in the path of a Pennsylvania woman seeking an abortion. *Casey,* 505 U.S. at 885–87, 112 S.Ct. 2791. Pennsylvania's abortion statute required that the physician who was to perform the abortion had to orally convey certain informed consent information to the woman at least twenty-four hours prior to the abortion. *See* 18 Pa. Cons.Stat. § 3205(a) (1990). Like the instant case, the Pennsylvania waiting period would essentially require a woman to make two trips to an abortion provider. *Casey,* 505 U.S. at 885–86, 112 S.Ct. 2791. Evidence was introduced in *Casey* that showed that the delay occasioned by the mandatory waiting period would often be longer than a day because of the distances many women had to travel to reach an abortion provider and that this delay would increase the exposure of some women to antiabortion pressure. *Id.* Similarly, the waiting period would be particularly burdensome on poorer women, those who lived the farthest from abortion providers, and those who would have difficulty explaining their absence to employers or spouses. *Id.* at 886, 112 S.Ct. 2791. Although the Court found these findings to be "troubling in some respects," *Casey,* 505 U.S. at 886, 112 S.Ct. 2791, the Court nevertheless concluded that the findings failed to demonstrate that Pennsylvania's waiting period constituted an undue burden on a woman's right to an abortion even though it had the effect of increasing the cost and length of delay in obtaining an abortion, *see id.* at 885–87, 112 S.Ct. 2791.

 The first issue we must address is whether *Casey* foreclosed the possibility that plaintiffs could challenge similar abortion restrictions in other state abortion statutes that were modeled after the Pennsylvania provisions found constitutional in *Casey.* We conclude plaintiffs are not precluded from challenging a waiting period provision nearly identical in all respects to the one upheld in *Casey.* We find support

for our conclusion in *Casey* itself and subsequent statements from two of the authors of the joint opinion in *Casey.*

First, *Casey* emphasized that its conclusion that the waiting period did not constitute an undue burden was based "on the record before us, and in the context of this facial challenge." *Id.* at 887, 112 S.Ct. 2791. Similarly, Justice Blackmun indicated in his concurring opinion that he was "confident that in the future evidence will be produced to show that 'in a large part of the cases in which [these regulations are] relevant, [they] will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" 505 U.S. at 926, 112 S.Ct. 2791 (Blackmun, J., concurring in part and dissenting in part) (quoting joint opinion, 505 U.S. at 895, 112 S.Ct. 2791). Indeed, Justice Scalia recognized as much in his dissenting opinion when he criticized the joint opinion's undue burden standard because it "may ultimately require the invalidation of each provision upheld today if it can be shown, on a better record, that the State is too effectively expressing a preference for childbirth over abortion." *Id.* at 992–93, 112 S.Ct. 2791 (Scalia, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted).

In addition, two of the authors of the joint opinion have subsequently indicated that they construe *Casey* as requiring lower courts to undertake an individualized inquiry into the effects of the regulations challenged in those jurisdictions, even if those regulations are virtually identical to those upheld in *Casey.* In denying plaintiff's application for a stay of North Dakota's informed consent statute in *Fargo Women's Health Organization v. Schafer,* 507 U.S. 1013, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993), Justice O'Connor, joined by Justice Souter, wrote separately to point out that a lower court must undertake an individualized factual inquiry based on the record before it in determining whether the challenged abortion restriction imposes an undue burden:

[W]e made clear [in *Casey*] that a law restricting abortions constitutes an undue burden, and hence is invalid, if, in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. And the joint opinion [in *Casey*] specifically examined the record developed in the District Court in determining that Pennsylvania's informed-consent provision did not create an undue burden. While I express no view as to whether the particular provisions at issue in this case constitute an undue burden, I believe the lower courts should have undertaken the same analysis.

*Id.* (O'Connor, J., concurring in denial of stay) (internal quotation marks and citations omitted). Similarly, after the remand from the Supreme Court in *Casey*, the district court reopened the record to hear evidence on the likely effects of the Pennsylvania statute under the undue burden standard. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 822 F.Supp. 227 (E.D.Pa.1993). The Third Circuit reversed the district court's reopening of the record, holding that the Supreme . Court did not intend to allow further proceedings on the merits of the case. *Casey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d 848, 863 (3d Cir.1994). Plaintiffs then applied to Justice Souter, as Circuit Justice, for a stay of the Third Circuit's reversal pending resolution of plaintiffs' petition to the Supreme Court. Justice Souter denied the application, but explained that "litigants are free to challenge similar restrictions in other jurisdictions, as well as these very provisions as applied." *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 510 U.S. 1309, 1313, 114 S.Ct. 909, 127 L.Ed.2d 352 (Souter, Circuit Justice, 1995).

In light of the foregoing, we believe that *Casey* does not foreclose plaintiffs from bringing facial challenges to abortion regulations in other states that are similar to those found constitutional in *Casey*. Indeed our conclusion here is the only one which affords Wisconsin women a fair shake because, as the district court aptly recognized, not all states are like Pennsylvania. States differ in the number of physicians who perform abortions, the number of abortion facilities, the distances women must travel in order to reach an abortion facility, and the average income of women seeking abortions. *See Karlin*, 975 F.Supp. at 1207. While a twenty-four hour waiting period that requires two trips to an abortion provider has been found not to impose an undue burden on Pennsylvania women based on the circumstances of that state at the time the Court decided *Casey*, a similar provision in another state's abortion statute could well be found to impose an undue burden on women in that state depending on the interplay of factors such as those identified above.

Convinced that plaintiffs may challenge AB 441's twenty-four hour waiting period, we now consider whether plaintiffs have proved that the factual circumstances in Wisconsin are such that the waiting period operates to impose an undue burden on women seeking abortions in Wisconsin. We note at the outset that plaintiffs have a tremendous hurdle to overcome in order to convince us that the district court erred in determining that AB 441's waiting period does not impose an undue burden on women seeking abortions in Wisconsin. Plaintiffs are contesting AB 441's waiting period on a facial challenge, meaning that the district court did not have the opportunity to consider evidence regarding the statute's actual impact on women seeking abortions in Wisconsin because the statute had not yet taken effect at the time the district court rendered its decision. The practical effect of bringing a facial challenge such as this in the abortion context is that it will be extremely difficult for a plaintiff to come forward with sufficient proof to convince a court that a restriction so similar to one found constitutional in *Casey* will place an undue burden on women in the forum state because plaintiffs

cannot demonstrate with any certainty that the restriction will have a significantly more burdensome effect on women in that state than the comparable restriction had on women in Pennsylvania. It should come as no surprise that, to the best of our knowledge, every post-*Casey* facial challenge to a waiting period requirement substantially similar to the one upheld in *Casey* has been found constitutional. *See, e.g., Miller,* 63 F.3d at 1467 (upholding South Dakota's twenty-four hour waiting period that would require one visit to an abortion provider); *Schafer,* 18 F.3d at 533 (upholding similar requirement contained in North Dakota statute); *Barnes v. Moore,* 970 F.2d 12, 15 (5th Cir.1992) (upholding Mississippi's twenty-four hour waiting period that required two trips to an abortion provider); *Utah Women's Clinic, Inc. v. Leavitt,* 844 F.Supp. 1482, 1494 (D.Utah 1994) (upholding Utah's twenty-four hour waiting period that required two trips to an abortion facility), *rev'd on other grounds,* 75 F.3d 564 (10th Cir.1995).

In the present case, the hardships of which plaintiffs complain are generally no different than those the Court in *Casey* held did not amount to an undue burden. To prove that these hardships will operate to prevent a significant number of Wisconsin women from obtaining abortions, especially low income women from rural areas, plaintiffs first presented evidence showing the factual and demographic differences between Pennsylvania and Wisconsin. Plaintiffs' evidence focused on the geographic distribution and scarcity of abortion providers in relation to the female population of Wisconsin, and plaintiffs argued that this evidence proved that Wisconsin's waiting period would be more burdensome on Wisconsin women than Pennsylvania's restriction was on Pennsylvania women. After carefully reviewing the evidence in detail, the district court concluded that the demographic differences between the two states were not significant enough to suggest that Wisconsin women are quantitatively more burdened by AB 441's waiting period than Pennsylvania women were by that state's waiting period. On appeal, plaintiffs fail to offer any convincing argument or point to any evidence in the record that would suggest that the district court erred in reaching this conclusion. While the evidence proffered by plaintiffs before the district court shows that AB 441's mandatory waiting period would likely make abortions more expensive and more difficult for some Wisconsin women to obtain, we must nevertheless conclude, as did the Court in *Casey,* that plaintiffs have failed to show that the effect of the waiting period would be to prevent a significant number of women from obtaining abortions.

At trial, plaintiffs primary evidence to show that AB 441 would likely have the effect of imposing an undue burden on a significant number of Wisconsin women was a statistical study conducted by plaintiffs' expert, Dr. Stanley Henshaw, in conjunction with several colleagues, that evaluated the actual effect of a similar Mississippi abortion statute on the number of abortions performed in Mississippi after that law's passage ("Mississippi Study"). The Mississippi statute, like AB 441, contained a twenty-four hour waiting period that effectively required a woman to make two visits to an abortion facility. By comparing the number of abortions performed seven months prior to the Mississippi statute's passage with the number performed five months after, the Mississippi Study found that (1) the number of Mississippi women undergoing reported abortions declined by approximately eleven to thirteen percent from the expected level calculated by Dr. Henshaw, (2) the number of Mississippi women obtaining abortions before reaching the nine week point of their pregnancies was twenty-five percent less than expected, and (3) the number of Mississippi women going out-of-state for abortions increased by seventeen percent. Not surprisingly, the Mississippi Study concluded, and Dr. Henshaw testified, that Mississip-

pi's mandatory waiting period was responsible for the decline in the abortion rates in Mississippi, the increase in the number of abortions performed later in the woman's pregnancy, and the increase in the number of women seeking abortions out-of-state.

In the present case, plaintiffs argued before the district court that the impact of Mississippi's waiting period on the ability of Mississippi women to obtain abortions in that state provided sufficient evidence to establish that Wisconsin's waiting period would likely cause a comparable reduction in the number of abortions performed in Wisconsin, thereby imposing an undue burden on a Wisconsin woman's right to abortion.

The district court concluded that the study contained a number of methodological flaws that precluded a finding that the decline in abortions in Mississippi resulted from the difficulties in making two trips to an abortion facility rather than from some other reason. For example, the district court found that the Mississippi Study failed to obtain information regarding the number of Mississippi women having abortions in Louisiana—a shortcoming of significance because the sole abortion facility in southern Mississippi closed in early 1992, the year that Mississippi's new abortion statute took effect. This fact meant that a number of women who would ordinarily obtain abortions in southern Mississippi would likely be forced to seek abortions in a nearby Louisiana facility. Although the Mississippi Study attempted to control for its lack of information on Louisiana abortions by reducing the decline in abortions figure by two percent, the district court found that the closing of the abortion clinic in Mississippi made that arbitrary reduction highly speculative.

The Mississippi Study's most significant shortcoming, however, is that it failed to adequately control for the persuasive effect of the law. In *Casey*, the Supreme Court recognized that a state has a profound interest in potential life from the outset of a woman's pregnancy. 505 U.S. at 878, 112 S.Ct. 2791. To promote that interest, a "State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion," provided that those measures do not place an undue burden on a woman's abortion right. *Id.* Thus, to prove that an abortion regulation poses an undue burden on a woman under *Casey*, it is not enough for a plaintiff to show that the number of abortions declined after the passage of a state abortion regulation because that result is entirely consistent with a state's legitimate interest in persuading a woman to carry her child to term. The plaintiff must also explain why the law had this effect.

While the Mississippi Study does show a decline in abortions after the passage of that state's abortion statute, the district court found that it does not adequately explain the reason for the decline—whether the drop in abortions is attributable to the persuasive effects of the law or the difficulties in making two trips to an abortion facility. Accordingly, the district court concluded that the Mississippi Study failed to establish that the waiting period caused the drop in Mississippi abortions and, thus, the Study bore no legal relevance to the inquiry into whether Wisconsin's waiting period would unduly burden a Wisconsin woman's choice to undergo an abortion.

On appeal, plaintiffs have pointed to no evidence in the record that would convince us to disturb the district court's ruling. Instead, plaintiffs argue that the district court's acceptance of two findings of the Mississippi Study—that the Mississippi law resulted in women leaving the state and obtaining later abortions—should have compelled the court, as a matter of law, to find that Wisconsin's waiting period would constitute an undue burden on women seeking abortions in Wisconsin. In es-

sence, plaintiffs ask that we ignore the district court's clear findings that the Mississippi Study contained significant shortcomings that made it impossible for the court to conclude that Mississippi's waiting period unconstitutionally caused the drop in Mississippi women receiving abortions in that state. Furthermore, not only would plaintiffs have us overlook the district court's rejection of plaintiffs' causation evidence, but they ask us to apply the Mississippi Study's suspect conclusions on the Mississippi experience to Wisconsin. We decline to do so.

Aside from making little sense, plaintiffs' argument mischaracterizes the district court's conclusions and the nature of its inquiry in this case. The district court recognized that the Mississippi Study reached certain conclusions regarding the impact of Mississippi's waiting period on the performance of abortions in that state. However, the necessary focus of the court's inquiry was whether those conclusions were justified and reliable—whether the waiting period, as opposed to some other factor or factors, caused the negative abortion trend in Mississippi. This inquiry ultimately led the court to conclude that the Mississippi Study was not reliable for the reasons we explained above. Plaintiffs otherwise point to no evidence and offer no convincing argument on appeal to show that the district court erred in reaching its determination that the Mississippi Study failed to prove that the drop in abortions in Mississippi is causally attributable to any unconstitutional effect of that state's mandatory waiting period. Accordingly, we conclude that the district court did not err in finding that plaintiffs failed to show that Wisconsin's waiting period is likely to impose an undue burden on Wisconsin women.

### 2. *Absence of an Express Mental Health Exception*

■ Plaintiffs next argue that AB 441 is unconstitutional because it does not contain an exception like the one found in Pennsylvania's abortion statute reviewed in *Casey* that permits a physician to forgo the informed consent requirements of the statute "if he or she can demonstrate by a preponderance of evidence, that he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient." *Casey*, 505 U.S. at 883–84, 112 S.Ct. 2791 (quoting 18 Pa. Cons.Stat. § 3205(c) (1990)). In support of their argument that the lack of an explicit mental health exception operates to impose an undue burden on a woman's right to choose whether to obtain an abortion, plaintiffs rely on *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), a case in which the Court concluded that a state abortion regulation cannot "straitjacket" a physician by requiring the physician to convey to a patient particular information that may not comport with the physician's medical judgment or the patient's needs. 476 U.S. at 762, 106 S.Ct. 2169 (quoting *Danforth*, 428 U.S. at 67 n. 8, 96 S.Ct. 2831). Plaintiffs argue that *Thornburgh* established the principle that a physician must be able to take into account a woman's mental health in complying with an abortion statute's informed consent requirements; a principle, plaintiffs submit, that *Casey* implicitly recognized by reaffirming the part of *Roe*'s holding that forbids states from interfering with a woman's choice to undergo an abortion procedure in a manner that jeopardizes the woman's health. *See Casey*, 505 U.S. at 880, 112 S.Ct. 2791 (citing *Roe*, 410 U.S. at 164, 93 S.Ct. 705). Accordingly, plaintiffs submit that AB 441 must contain, as a matter of law, a mental health exception under which physicians can omit from their required informed consent discussion that information the physician believes might psychologically harm the woman.

■ Although the district court rejected plaintiffs' argument, the district court nevertheless found two situations in which a physician had to be permitted to exercise

the discretion plaintiffs seek in order for AB 441 to be constitutional. Evidence at trial showed that requiring a physician to provide information about a father's responsibility for child assistance to a woman who became pregnant as a result of sexual assault or incest could cause a woman severe psychological harm. Similarly, the court found that the distribution of information about a father's liability and the availability of state assistance to a woman whose fetus has been diagnosed with a lethal anomaly could also cause the woman to suffer severe psychological harm. Because the provision of such information in those two situations could cause severe psychological harm, as opposed to some form of heightened anxiety, the court held that AB 441 was constitutional only if construed as not requiring physicians to provide that information in those situations. Defendant McCann cross appeals, arguing that the informed consent information must be provided in all circumstances involving rape and incest.[16]

We note at the outset of our analysis that the Supreme Court has never required that an informed consent statute in the abortion context contain an express mental health exception permitting a physician to exercise the type of discretion plaintiffs seek. In *Casey*, the Supreme Court merely recognized the existence of such a provision in the Pennsylvania abortion statute, but by no means held that such a provision was a prerequisite to a finding of the statute's constitutionality. *See id.* at 883–84, 112 S.Ct. 2791; *see also Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352, 375 n. 7 (4th Cir. 1998) (doubting that the Court would require a mental health exception even to an abortion regulation that banned certain abortions rather than just delaying their performance); *cf. Voinovich*, 118 S.Ct. at 1348 (Thomas, J., joined by Rehnquist, C.J. & Scalia, J., dissenting from denial of certiorari) (concluding that a finding of unconstitutionality based on the lack of an explicit mental health exception in a post-viability statute was an unwarranted extension of the Court's precedents).

Notwithstanding this point, we conclude that the only logical reading of AB 441 demonstrates that the medical emergency provision requires a physician to be able to exercise some degree of discretion in a pre-viability [17] context when providing the information set forth in the informed consent section of the statute to a woman when the provision of this information would create a significant threat to a woman's health. We reach this conclusion for two reasons.

First, AB 441 contains a section setting forth the Wisconsin legislature's intent in enacting the statute. The very first statement of the legislature's intent provides

---

16. Defendants do not contest that the specified information need not be given to women whose fetuses have been diagnosed with lethal fetal anomalies. However, we believe a different ground from that offered by the district court justifies striking down the mandatory provision of this information in these situations. While it may certainly be true that information pertaining to the father's liability and the availability of state assistance may cause a woman in such a situation severe mental harm, we do not need to reach this issue as a categorical matter because the provision of this information furthers no legitimate purpose. In *Casey*, the Court stated that the informed consent provisions furthered the twin important state interests of protecting maternal health and fetal life. *See Casey*, 505 U.S. at 846, 112 S.Ct. 2791.

As we understand the term "lethal anomaly" it means that the child will die at birth. Consequently, the mandatory provision of information relating to a father's child support obligations and the availability of state child-rearing assistance serves no legitimate state interest and makes little sense under the circumstances. We fail to see how the provision of this largely irrelevant information helps a woman "facilitate the wise exercise of [her abortion] right." *Id.* at 887, 112 S.Ct. 2791. Thus, irrespective of our analysis below, we hold that the provision of such information is not mandated under AB 441.

17. Wisconsin has a separate statute addressing post-viability abortions. *See* Wis. Stat. § 940.15. That statute is not presently before us.

that AB 441 is designed to further the important and compelling state interests in "[p]rotecting the life and health of the woman subject to an elective abortion and, to the extent constitutionally permissible, the life of her unborn child." Wis. Stat. § 253.10(1)(b)1. It would truly cut against AB 441's express legislative intent if a physician was required to provide information to a woman that would have a severe adverse impact upon her mental health. Furthermore, it would also seem illogical for a state to seek to protect a woman's physical health while at the same time casting aside all concerns regarding her mental health.

Second, we conclude that AB 441's medical emergency provision is broad enough to encompass significant threats to a woman's mental well-being. As we have previously indicated, the medical emergency provision provides that a physician can dispense with AB 441's waiting period and informed consent requirements if there is a "serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions." *Id.* § 253.10(2)(d). In *Casey,* the Supreme Court adopted the Third Circuit's construction of similar language contained in the Pennsylvania statute to allow physicians to perform immediate abortions when there is a "significant threat to a woman's health." *Casey,* 505 U.S. at 880, 112 S.Ct. 2791. Although the Third Circuit in *Casey* limited its construction of the Pennsylvania statute to only physical conditions (and this construction was left undisturbed by the Supreme Court), we believe the medical emergency provision of AB 441 is broad enough to reach significant threats to both physical and mental health. As the Supreme Court recognized in *Casey,* "[i]t cannot be questioned that psychological well-being is a facet of health." *Id.* at 882, 112 S.Ct. 2791; *see also United States v. Vuitch,* 402 U.S. 62, 72, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971) (construing the term "health" in an abortion statute that banned abortions except when necessary for the preservation of the

mother's life or health to include psychological as well as physical well-being); *accord Doe v. Bolton,* 410 U.S. 179, 191–92, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (same). Moreover, nothing in AB 441's language suggests that the medical emergency provision is intended to extend only to medical emergencies arising from serious physical conditions. Indeed, our conclusion here finds support in two decisions from the Eighth Circuit that found that the lack of an explicit mental health exception did not invalidate two abortion statutes because each contained a similar medical emergency provision that the Eighth Circuit determined was broad enough to cover the mental health of the patient. *See Miller,* 63 F.3d at 1467; *Schafer,* 18 F.3d at 532–33.

Thus, we conclude that when a reasonable physician would determine that some specific information required to be given under AB 441's informed consent provisions would cause a woman psychological harm sufficient to rise to the level of a medical emergency, the physician may forgo providing this specific information to the woman. This conclusion does not, however, exempt the physician from otherwise complying with AB 441's informed consent requirements or the twenty-four hour waiting period. The physician still must provide the woman with all other required information that does not create a significant, non-temporary threat of severe harm to the woman's mental health, even if this information makes the woman extremely uncomfortable or creates a substantial degree of anxiety.

Accordingly, we reject the district court's piecemeal attempt to determine certain circumstances in which a physician must be permitted to exercise discretion and find that the lack of an express mental health exception does not render AB 441 unconstitutional.

### 3. *Cross Appeal of District Court's Severance of Wis. Stat. § 253.10(3)(c)1.g*

We now turn to the cross appeal brought by defendant McCann challenging

the district court's conclusion that Wis. Stat. § 253.10(3)(c)1.g ("fetal heartbeat provision") imposed an undue burden on a woman's right to an abortion. This provision required physicians to inform their patients that "fetal ultrasound imaging and auscultation of fetal heart tone services are available that enable a pregnant woman to view the image or hear the heartbeat of her unborn child. In so informing the woman and describing these services, the physician shall advise the woman as to how she may obtain these services if she desires to do so." *Id.* Pursuant to this provision, a physician is required to inform a woman that two services are available: fetal ultrasound imaging, which would enable the woman to view the image of her unborn child, and fetal auscultation services, which enable the woman to hear the unborn child's heartbeat.

■ In *Casey,* the Supreme Court indicated that, as a general matter, a state has wide latitude in imposing regulations that are designed to ensure that a woman makes a thoughtful and informed choice so long as those regulations do not place an undue burden on the woman's right to choose to have an abortion. *See* 505 U.S. at 881–84, 112 S.Ct. 2791. As long as a particular informed consent requirement is designed to further a legitimate state interest, whether it is protecting the life and health of the mother or the life of the fetus, it will not be considered a substantial obstacle to obtaining an abortion provided that the information that the state "requires to be made available to the woman is truthful and not misleading." *Id.* at 882–83, 112 S.Ct. 2791. Therefore, under ·*Casey,* an informed consent provision that requires the distribution of false and misleading information places an unconstitutional burden on a woman's right to choose.

■ In striking down the fetal heartbeat provision, the district court focused on the provision's requirement that a physician inform a woman that auscultation of fetal heart tone services are available that enable a pregnant woman to hear her unborn child's heartbeat. The district court found that there are two methods by which fetal heartbeats can be auscultated (*i.e.,* listened to): a hand-held ultrasound machine and a stethoscope. Utilizing either of the two methods, the earliest that a fetal heartbeat can be heard is approximately ten to twelve weeks after conception. However, many women seek and obtain abortions before they reach ten weeks of gestation. Based on this evidence, the district court concluded that the information required to be conveyed under § 253.10(3)(c)1.g was "false and misleading" because it demanded that a physician tell a woman who was less than ten weeks pregnant that fetal auscultation services "are available" to enable her to hear her unborn child's heartbeat, even though currently available auscultation technology cannot discern a fetal heartbeat at that point in the woman's pregnancy. In reaching this conclusion, the district court compared the fetal heartbeat provision to the provision requiring a physician to inform a patient that the father "is liable" for assistance. *See* Wis. Stat. § 253.10(3)(c)2.b. The court construed the latter provision as permitting the physician to explain the difficulties of obtaining child support, but found no such flexibility in the former provision.[18] As a result, the court held that the fetal heartbeat provision placed an undue burden on a woman's right to choose and struck the provision from AB 441. *Karlin,* 975 F.Supp. at 1194, 1218–19.

On appeal, defendant McCann challenges the court's conclusion that the fetal heartbeat provision imposed an undue bur-

---

**18.** Plaintiffs similarly argued before the district court that this provision required physicians to provide information that was false and misleading. The district court disagreed, finding that the provision is constitutional based on its reading of the provision to permit physicians to explain the difficulties of obtaining child support. Plaintiffs have not appealed this ruling.

den by arguing that it was unreasonable for the district court to interpret the provision as requiring a physician to tell a woman that fetal auscultation services are available when she is less than ten weeks into her gestation period. McCann argues that the district court's interpretation was hypertechnical and that the provision is constitutional when read with common sense. McCann submits that the proper and more reasonable interpretation of the provision reveals that it does not require a physician to tell a woman that she will be able to view the image or hear the heartbeat of her unborn child when those observations are technologically impossible; it merely requires a physician to tell the woman that such services are available in the general sense. McCann argues that the first sentence of the fetal heartbeat provision refers to general information relating to the existence of the two technologies, whereas the second sentence focuses on the particular circumstances of the woman. So construed, McCann believes the provision does not preclude a physician from explaining to a woman with an insufficiently developed fetus that the specified services are not available yet.

We find McCann's argument persuasive. First, the information required to be conveyed under the fetal heartbeat provision is neither false nor misleading because the services are available to all women; it is simply a question of when such services would render useful results. Furthermore, the language of the provision is not so narrow as to preclude a physician from being able to fully explain the availability of the identified services. Indeed, we see no reason why the provision would not also necessitate a physician to fully explain these services at issue. This interpretation is consistent with our earlier holding that the information requirements are topical in nature and simply identify certain categories of information that need to be discussed with a woman seeking an abortion, leaving the exact content of the discussion to the discretion of the physician. Like the informed consent provision that

requires a physician to discuss the risk of psychological trauma, a physician is required to inform the woman that fetal heartbeat services are generally available, but consistent with our interpretation of the former provision, if the physician believes that such services are not specifically available to a patient because her fetus has not reached a particular gestational age, then that is what the physician must disclose.

Second, we see no basis for the district court's distinction between the provision at issue and the provision requiring disclosure of the liability of the father for financial assistance and a comparison of the relevant language of these provisions proves this point. The paternal liability provision provides "[t]hat the father of the unborn child *is liable* for assistance in the support of the woman's child," Wis. Stat. § 253.10(3)(c)2.b (emphasis added), while the fetal heartbeat provision provides "[t]hat fetal ultrasound imaging and auscultation of fetal heartone services *are available* that enable a pregnant woman to view the image or hear the heartbeat of her unborn child," *id.* § 253.10(3)(c)1.g (emphasis added). It is unclear to us why the district court felt that the wording of the paternal provision permitted a "physician to explain the difficulties of obtaining child support" (thereby assuaging any constitutional concerns of the district court regarding whether the information was false and misleading) and why the wording of the fetal heartbeat provision would not also allow a physician to provide a full explanation concerning the services at issue. This is especially true in light of the additional language contained in the second sentence of the fetal heartbeat provision specifically contemplating that a physician is to describe the services and explain to a woman how she may take advantage of the services: "In so informing the woman and describing these services, the physician shall advise the woman as to how she may obtain these services if she desires to do so." *Id.* In

our view, any distinction between the phrases "is liable" and "are available" is arbitrary. Accordingly, we conclude that the district court erred in striking down the fetal heartbeat provision on the basis that it required the provision of "false and misleading" information.

### D. Purpose Challenge

 Plaintiffs' final challenge on appeal is that the district court erred in concluding that AB 441 does not have an unconstitutional purpose. Under *Casey*, an abortion law may also be found to impose an undue burden on a woman's abortion right if it was enacted with the *purpose* of placing a substantial obstacle in the path of a woman seeking an abortion of a non-viable fetus. 505 U.S. at 877, 112 S.Ct. 2791. Prior to *Casey*, pre-viability regulations enacted with any purpose other than protecting maternal health were routinely struck down as unconstitutional, including those designed to further the state's interest in protecting fetal life by persuading a woman to choose childbirth over abortion. *See, e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 442–45, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (striking down informed consent provisions of an Ohio abortion law containing information and a twenty-four hour waiting period requirements); *Thornburgh*, 476 U.S. at 762, 106 S.Ct. 2169 (striking down a similar Pennsylvania informed consent provision). In *Casey*, however, the Court rejected this practice of undervaluing the state's legitimate interest from the outset of a woman's pregnancy in protecting the life of the unborn child.

*Casey* recognized at least two important and legitimate state interests that justify regulating abortion: protecting the life and health of the mother and protecting the potentiality of human life. 505 U.S. at 871–73, 112 S.Ct. 2791. After *Casey*, a statute is considered to have an invalid purpose only if the means chosen by the state to further its legitimate interests in

protecting potential life and maternal health are calculated to hinder a woman's free choice, rather than to inform it. *Id.* at 877–78, 112 S.Ct. 2791. Put another way, a state may advance its legitimate interest in potential life by enacting measures designed to ensure that a woman's choice is informed and mature as long as the purpose of such measures is to persuade the woman to choose childbirth over abortion rather than to prevent the woman from exercising her right to choose. *Id.*

While a plaintiff can challenge an abortion regulation on the ground that the regulation was enacted with an impermissible purpose, the joint opinion in *Casey* and the Court's later decision in *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), suggest that such a challenge will rarely be successful, absent some sort of explicit indication from the state that it was acting in furtherance of an improper purpose. In fact, the Court in *Casey* devoted little attention toward analyzing the purpose behind Pennsylvania's abortion statute. It is reasonable to conclude that the Court's decision not to engage in any inquiry into the Pennsylvania statute's purpose indicates that the nature and structure of that statute's provisions coupled with the express indications of the Pennsylvania legislature contained in the Pennsylvania statute's purpose section, *see* 18 Pa. Cons.Stat. § 3202(a) (1990), were more than sufficient to show that the statute was passed with a proper purpose or purposes in mind. *Casey* would seem to indicate that the Court would not scrutinize too closely the stated purpose or purposes of a regulation given the state's legitimate interest from the outset of a woman's pregnancy in persuading women to choose childbirth over abortion as long as the regulation was reasonably designed to further that interest. For example, the Court accepted at face value the state's explanation that the informed consent and twenty-four hour waiting period provisions were designed to protect the health of the mother and the life of the

unborn child by ensuring that a woman's decision is both well-informed and made after an adequate period of reflection. *Casey*, 505 U.S. at 881–87, 112 S.Ct. 2791. Similarly, after finding that the Pennsylvania statute's record-keeping and recording requirements served an important state interest by advancing medical research, the Court concluded that the requirements did not impose an undue burden because "it cannot be said that the requirements serve no purpose other than to make abortions more difficult." *See id.* at 901, 112 S.Ct. 2791.

The only other guidance from the Court on *Casey*'s purpose prong comes from its per curiam decision in *Mazurek*—a decision that suggests that plaintiffs challenging abortion statutes will face significant difficulty in showing that an otherwise constitutional abortion regulation was enacted with an impermissible purpose. In *Mazurek*, plaintiffs sought to enjoin the enforcement of a Montana abortion statute that restricted the performance of abortions to licensed physicians on the ground that the purpose of the provision was to impose a substantial obstacle in the path of a woman seeking a pre-viability abortion. 520 U.S. at 970–73, 117 S.Ct. 1865. Plaintiffs argued that the purpose behind the regulation was not to protect a woman's health, but rather to limit a woman's access to abortion, because evidence showed that properly trained physician-assistants were capable of performing early abortions just as well as licensed physicians. *Id.* Plaintiffs submitted that the lack of medical evidence showing that the Montana regulation would protect the health of the woman proved that the Montana regulation must have had an invalid purpose.

Relying on *Casey*, the Court rejected plaintiffs' argument and reasoned that states have broad latitude to determine when licensed professionals should perform particular functions even when an objective assessment shows that those tasks could be performed equally as well by others. *Id.* at 973, 117 S.Ct. 1865 (cit-ing *Casey*, 505 U.S. at 885, 112 S.Ct. 2791). In addition, the Court held that the fact that an antiabortion group drafted the Montana regulation showed nothing significant about the Montana legislature's purpose in passing the legislation. *Id.* *Mazurek* even went so far as to hint that it is questionable whether a statute enacted with the purpose of interfering with the woman's constitutionally protected right to abortion can be found unconstitutional if it does not have the actual effect of interfering with that right. *Id.* at 972, 117 S.Ct. 1865. While the Court stopped short of conclusively reaching this determination because it found no improper purpose, our reading of *Mazurek* suggests that a state abortion regulation will survive an impermissible purpose challenge if it is a reasonable measure designed to further the state's legitimate interest in protecting either the life of the fetus or the health of the mother; provided that it cannot be shown that the legislature deliberately intended the regulation to operate as a substantial obstacle to women seeking abortions.

Plaintiffs argued before the district court that the Wisconsin legislature's impermissible purpose in passing AB 441 could be demonstrated in four respects: (1) rejected amendments to AB 441 that would have lessened the burdens of the statute on women; (2) statements made by individual members of the legislature expressing opposition to abortion; (3) the fact that AB 441 was supported by anti-abortion organizations; and (4) the testimony of defendant's own expert that the prior Wisconsin informed consent statute was adequate to insure a woman's informed consent. The district court rejected plaintiffs' arguments and concluded that the evidence put forth by plaintiffs failed to establish that the passage of AB 441 was motivated by any unconstitutional purpose on the part of the Wisconsin legislature. Relying on *Casey*, the court found that the changes brought about by AB 441, while perhaps not necessary to protect a

woman's health, were based on a permissible purpose because they were reasonably related to the state's legitimate interest in promoting childbirth over abortion.

On appeal, plaintiffs have shifted their focus away from the arguments they presented before the district court and now contend that the district court erred by concluding that *Casey* controlled the determination of whether the Wisconsin legislature acted with an illegitimate purpose in passing the legislation at issue. Plaintiffs also assert that AB 441's illegitimate purpose is evident from the fact that AB 441 is more restrictive than the portions of the Pennsylvania statute found constitutional by the Court in *Casey* and from the fact that AB 441 is allegedly unconstitutional on its face. We consider each of these arguments in turn.

In reaching its conclusion that AB 441 was not passed with an impermissible purpose, the district court referenced the standard set forth by the Court in *Casey*—legislation is based on a permissible purpose if it is reasonably related to promoting childbirth over abortion or protecting maternal health. *See Casey,* 505 U.S. at 878, 112 S.Ct. 2791. In light of this standard, the district court concluded that the provisions challenged by plaintiffs bore a reasonable relationship to the state's goal of promoting childbirth over abortion. The district court also appears to have been influenced by the fact that the Court in *Casey* reviewed similar provisions in the Pennsylvania abortion statute and did not find that they revealed an impermissible legislative purpose. Not content to end its analysis on this point, the district court went on to pronounce that "[w]ere *Casey* not binding, I might be inclined to hold that AB 441 was passed with an impermissible purpose.... However, lower courts are bound by Supreme Court precedent. I do not see how *Casey* does not control this question." *Karlin,* 975 F.Supp. at 1212.

Plaintiffs argue that "the district court was wrong in holding that *Casey* controls any determination about the Wisconsin Act." Plaintiffs appear to have construed the opinion of the district court as saying that "because the Court in *Casey* did not find an impermissible purpose, I should not find one here." Plaintiffs badly misconstrue the point of the district court's assessment that "*Casey* controls this question." While the Court in *Casey* expended little time on assessing the purpose of the Pennsylvania abortion statute, there is no denying the fact that the Court did set forth the standard by which the purpose inquiry must be made. As the district court noted, "lower courts are bound by Supreme Court precedent." And indeed, this is what the district court recognized in applying the standard set forth in *Casey*. We find no error in the district court's recognition that *Casey* controls the purpose inquiry.

Plaintiffs next argue that AB 441 has an impermissible purpose because it "goes far beyond the Pennsylvania statute." Plaintiffs point to several provisions of AB 441 that, in their opinion, make AB 441 more restrictive and more likely to chill the privacy rights of women in Wisconsin than the Pennsylvania statute. We fail to see how the fact that an abortion statute imposes greater or different restrictions than those considered by the Court in *Casey* automatically demonstrates that the statute was drafted with an impermissible purpose. Nowhere does the Court in *Casey* suggest that the provisions of the Pennsylvania statute it found to be constitutional were intended to set the outer limits of permissible abortion regulations. For example, a statute imposing a twenty-five hour waiting period for abortions is arguably more restrictive than the Pennsylvania abortion statute, but this fact alone is insufficient to show that the statute was enacted with an impermissible purpose.

To find an impermissible purpose on this basis alone would be to ignore the Wisconsin legislature's stated purpose in enacting this legislation:

It is the intent of the legislature in enacting this section to further the important and compelling state interests in all of the following:

1. Protecting the life and health of the woman subject to an elective abortion and, to the extent constitutionally permissible, the life of her unborn child.

2. Fostering the development of standards of professional conduct in the practice of abortion.

3. Ensuring that prior to the performance or inducement of an elective abortion, the woman considering an elective abortion receive personal counseling by the physician and be given a full range of information regarding her pregnancy, her unborn child, the abortion, the medical and psychological risks of abortion and available alternatives to the abortion.

4. Ensuring that a woman who decides to have an elective abortion gives her voluntary and informed consent to the abortion procedure.

Wis. Stat. § 253.10(1)(b). We find nothing impermissible on the face of these stated purposes and will not cast them aside lightly. Absent some evidence demonstrating that the stated purpose is pretextual, our inquiry into the legislative purpose is necessarily deferential and limited. *See Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469–70, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion) ("This Court has long recognized that [i]nquiries into congressional motives or purposes are a hazardous matter, and the search for the actual or primary purpose of a statute is likely to be elusive." (internal quotation marks and citations omitted)); *see also Wallace v. Jaffree,* 472 U.S. 38, 74–77, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring).

Plaintiffs' argument that the statute has an impermissible purpose because it goes beyond the restrictions of the Pennsylvania statute might have some merit if the legislature expressly stated that AB 441's purpose was to limit a woman's right to chose whether to have an abortion or this fact was clear on the face of AB 441. Such was the case when the Court of Appeals for the Tenth Circuit struck down a Utah statute that permitted abortions after twenty weeks' gestational age in only three narrow circumstances, thereby essentially establishing viability at twenty weeks. *See Jane L. v. Bangerter,* 102 F.3d 1112 (10th Cir.1996). The court identified the Utah legislature's intent in passing the abortion provisions as a means to provide a vehicle by which to challenge *Roe.* The court noted that the legislature made a deliberate decision to disregard controlling Supreme Court precedent set out in several cases and ignored the Court's repeated directive that viability is a matter for an attending physician to determine. According to the Tenth Circuit, these facts evinced an intent to prevent a woman from exercising her right to choose an abortion after twenty weeks in those instances where the fetus was not viable. *Id.* at 1116–17.

■ While we recognize that a legislature's impermissible intent will not always be as readily discernable as was the case in *Bangerter,* a party attempting to show an impermissible intent must nevertheless come forward with some evidence of unconstitutional intent or purpose especially when the legislature has otherwise identified permissible purposes in enacting the legislation being challenged. Plaintiffs' reliance on the simple fact that the Wisconsin statute may be more restrictive in some respects than the Pennsylvania abortion statute without more is insufficient to show an impermissible purpose.

■ Plaintiffs' final argument is that the unconstitutional purpose of AB 441 is apparent on the face of the statute. Plaintiffs contend that the purpose of AB 441 is to chill physicians in the performance of abortions and that this purpose is evident from: (1) the strict liability imposed for violation of AB 441's numerous vague requirements; (2) the inclusion of an objec-

tive reasonableness standard governing the definition of medical emergency; (3) the inclusion of a greater number of informed consent requirements than the Pennsylvania statute; and (4) the failure to include an explicit mental health exception. We have just dispensed with the argument that the fact that a statute has more or greater requirements than the requirements upheld by the Court in *Casey* does not automatically demonstrate an impermissible purpose (plaintiffs' third argument). We are then left to consider plaintiffs' citation to provisions of AB 441 that we have previously upheld in this opinion and whether these provisions demonstrate an impermissible purpose.

The Supreme Court has stated that it will not assume unconstitutional legislative intent "even when statutes produce harmful results ... much less do we assume it when the results are harmless." *Armstrong*, 520 U.S. at 972, 117 S.Ct. 1865 (citation omitted). In the present case, we have upheld each of the provisions plaintiffs now complain demonstrates an impermissible purpose. In essence, we have found the imposition of a strict liability for violations of AB 441's provisions and the inclusion of an objective standard governing the definition of a medical emergency to be "harmless" because they are not unconstitutionally vague, nor do they impose an undue burden on a woman's right to choose whether to have an abortion. Moreover, we found the medical emergency provision broad enough to permit a physician to consider a woman's mental health if providing certain information would create a serious risk to her health. In light of these conclusions, we· simply cannot find any impermissible purpose in the Wisconsin legislature's passage of AB 441.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is, consistent with this opinion, AFFIRMED in part, and REVERSED in part.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

Abortion and its regulation are about as sensitive and contentious as things get in our society. If a court can deal with them in a way that seems credible and reassuring—not to mention just—something has been accomplished. Judge Crabb has subjected Assembly Bill 441 to an insightful and painstaking analysis, which cannot help but be reassuring. The majority has affirmed the bulk of her findings and I agree, in general, with its discussion of the core provisions of AB 441. However, the question whether a doctor's "reasonable medical judgment" may constitutionally be the standard for determining whether a medical emergency exists remains for me an important and debatable issue. Before attempting to resolve it, I would certify to the Wisconsin Supreme Court the issue whether as a matter of state law scienter would be required for the imposition of civil forfeiture liability under the Act. If state law were construed so that AB 441 contained a subjective element, a serious constitutional issue would be avoided.

AB 441's medical emergency provision is modeled on the Pennsylvania law that was upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), with two important differences. First, while the Pennsylvania statute—and other statutes modeled on its terms—employ a subjective, "good faith" standard, Wisconsin instead has enacted an objective reasonableness test to evaluate a physician's decision to bypass the informed consent procedures in emergency situations. Second, the Wisconsin law is enforceable with civil penalties but not by criminal sanctions. In some respects, these modifications of the Pennsylvania model have offsetting effects in the constitutional calculus. The objective reasonableness test argues against constitutionality while the civil nature of the penalties argues for it. As the majority concedes, AB 441 *appears* to

be a strict liability statute: a physician who bypasses the informed consent requirements in the belief that an emergency abortion is necessary will be strictly liable in cases where his or her decision is subsequently determined to have been unreasonable. The physician will face forfeiture of between $1,000 and $10,000, a possible civil damages action at the hands of the patient as well as professional disciplinary action. In addition, the statute contains no scienter requirement. Although most of the precedent is in the criminal rather than the civil context, no purely objective standard for physician conduct in the context of emergency abortions has previously been upheld.

Judge Crabb dealt with this issue by observing that there would be "few situations in which a doctor would think that she was making a good faith judgment to perform an emergency abortion but not a reasonable one." *See Karlin v. Foust*, 975 F.Supp. 1177, 1222 (W.D.Wis.1997). She also noted that the plaintiff physicians performing abortions are confronted with only a very small number of such emergencies each year. I think that these observations cut to the practical heart of the matter. But we must address the issue in principle as well as in practice. For the plaintiffs here contend, with the support of substantial authority, that the willingness of physicians to engage in an abortion practice will be significantly chilled if they must face the prospect of being second-guessed by a judge or jury on the reasonableness of their evaluation of medical emergencies. Therefore, say the plaintiffs, the proper standard must be good faith.

As I read the majority opinion, it is saying two things about this issue. First, it is saying that the objective reasonableness standard is not vague because of ambiguity (a vice found in the Ohio statute in *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187 (6th Cir.1997)). Second, the majority tries to answer the objection that the statute is vague because it exposes the doctor to second-guessing on the issue of reasonableness. The majority holds on this issue that doctors already risk second-guessing on malpractice liability based on alleged unreasonable conduct. Hence, their willingness to engage in an abortion practice will not suffer any incremental chill if one more sanction for unreasonableness is invoked against them. The argument seems to be that one more risk of second-guessing will add nothing to the concern of the physician already suffering other risks of the same kind. Perhaps this analysis might prove pragmatically correct in certain cases but it can be just as easily argued that the threat of an additional penalty—civil forfeiture—based on unreasonableness will lower the temperature of the existing chill a few or many more degrees. Such a deepening chill might particularly occur in the controversial area of abortion. Certainly, there are several cases that strongly suggest the unconstitutionality of a purely objective standard.

In *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), the Court struck down Pennsylvania's viability-determination provision principally on the ground that its mixed subjective-objective standard was ambiguous. But the Court also stressed that the fate of the Pennsylvania provision was compounded by related concerns: the statute's strict criminal and civil liability, the absence of a scienter requirement and the uncertainty and probable disagreement surrounding the medical decision. These factors, the Court concluded, could have "a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment." 439 U.S. at 396, 99 S.Ct. 675. While, as I have noted, the Wisconsin statute at issue in the present case does not suffer from the flaw of a mixed and ambiguous standard, if it contains no scienter requirement, it may be tainted with *Colautti*'s related concerns. For the physician is subject to strict civil and quasi-criminal liability and the deter-

mination whether a medical emergency exists—like the viability determination—is fraught with uncertainty and susceptible to dispute. Thus, the Court's prophetic words of caution seem apposite to the case at hand.

Our sister circuits that have addressed the issue have emphasized the propriety of a subjective, in contrast to an objective, approach to medical emergencies in the abortion context. In *Voinovich*, the Sixth Circuit held that a mixed subjective-objective standard without a scienter requirement rendered Ohio's medical emergency provision unconstitutionally vague. Echoing the Supreme Court, the Sixth Circuit also expressed its disquiet over Ohio's use of an objective standard without a scienter requirement, a combination which it considered "especially troublesome in the abortion context." 130 F.3d at 205. The Sixth Circuit concluded: "The objective standard combined with strict liability for even good faith determinations, could have a profound chilling effect on the willingness of physicians to perform abortions, ... when the woman's health or life is threatened." *Id.* (internal quotation and citation omitted). The Third and Eighth Circuits have headed in the same general direction. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682 (3d Cir.1991) (upholding a subjective standard on the ground that no physician practicing in good faith need fear conviction); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526 (8th Cir.1994) (upholding a subjective standard combined with a scienter requirement); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452 (8th Cir.1995) (striking down a South Dakota statute that applied strict criminal and civil liability for violation of the medical emergency provision without a scienter requirement). A recent district court case in Alabama reaches the same conclusion. *See Summit Medical Assocs., P.C. v. James*, 984 F.Supp. 1404 (M.D.Ala. 1998).

The majority seeks to dodge the brunt of these authorities by emphasizing that none stands directly for the proposition that an objective standard is unconstitutional *per se*. This seems an overly technical reading of the case law. While it is one thing to say that these authorities do not directly rule out the majority's position, it is quite another to suggest that they actually support it. Contrary to the majority's view, these authorities clearly underscore the desirability of some form of scienter requirement.

The majority opines that there is no need for scienter here because under AB 441 a physician is subject only to financial liability, whether in the form of forfeiture or of an action for damages by the woman on whom the abortion was performed. But I cannot agree with the majority's pronouncement the forfeiture provision is "qualitatively no different from the threat of civil liability under AB 441." *Ante* at 467, AB 441 directs the State to impose a penalty of not less than $1,000 and not more than $10,000 on a physician who violates its terms. The forfeiture provision has certain punitive characteristics: for example, it promotes the traditional aims of punishment—retribution and deterrence—and it has no other readily discernible purpose. *See Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997) (listing "useful guideposts" in classifying civil remedies as opposed to criminal penalties). *See also Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 779, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) ("fines, penalties, and forfeitures are readily characterized as sanctions"). It is reasonable to conclude that the forfeiture provision was intended to be punitive and may be aptly characterized as quasi–criminal. The theoretical objections to the imposition of criminal or quasi–criminal liability without a scienter requirement are well known. *See, e.g., Staples v. United States*, 511 U.S. 600, 605–06, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *Miller*, 63 F.3d at 1465–67. Indeed, in the present case, the appellees

appear to concede that enforcement by way of forfeiture prosecutions under AB 441 may be problematic. *See* Appellee's Br. at 29, note 4.

Nor am I persuaded by the majority's extensive analogy to tort standards that govern in other medical contexts. Just because the unreasonableness of a doctor's conduct may be put in question in a malpractice suit does not mean that his or her vulnerability to forfeiture liability also based on unreasonableness will not add to the chilling effect. It seems to me that Wisconsin's use of an objective standard, combined with the strict liability and the arguable absence of a scienter requirement, may place an excessive burden on the medical profession. Under AB 441, a physician who performs an emergency abortion may be liable—even of the action was in good faith on the basis of the doctor's best medical judgment—if the physician is subsequently deemed to have acted unreasonably.

The use of a purely objective standard for medical emergencies may also complicate the discussion about the absence of an express mental health exception in AB 441. I endorse the majority's conclusion that "the only logical reading of AB 441 demonstrates that the medical emergency provision requires a physician to be able to exercise some degree of discretion in a pre–viability context when providing the information set forth in the informed consent section of the statute to a woman when the provision of this information would create a significant threat to a woman's health." *Ante* at 489 (note omitted). But if an *objective* standard without a scienter requirement is applied to a physician's exercise of discretion under the majority's view, many of the same problems that I have discussed in connection with emergency abortions may arise. Hence, the imposition of a scienter requirement would be helpful in arriving at a constitutional resolution.

All of the foregoing discussion becomes academic if there is an implied scienter term in the "reasonable medical judgement" provision of AB 441. *See State of Wisconsin v. Olson*, 175 Wis.2d 628, 498 N.W.2d 661 (1993) (reading a scienter requirement into a traffic statute imposing civil penalties). If, in order to violate the emergency abortion provision and related provisions—and implicate the forfeiture provisions—a doctor would have to act "knowingly" or "wilfully," I would see no further constitutional problem. Hence, I would certify the scienter problem to the Wisconsin Supreme Court in the hope that a possible construction of state law might obviate any need for federal intervention.